UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

In re:                                          )
LORING E. JUSTICE                               )        Case No. 1:11-mc-3
BPR No. 019446                                  )        Chief Judge Curtis L. Collier
                                                )
                                                )
                                                )
                                                )

## REVISED MEMORANDUM & ORDER [REDACTED]

The Court, having received information suggesting Respondent Loring E. Justice ("Respondent") may have "violated the Rules of Professional Conduct as adopted by the Supreme Court of Tennessee [and] engaged in unethical conduct tending to bring the Court or the bar into disrepute," E.D. Tenn. L.R. 83.7(a), issued a Show Cause Order requiring Respondent to demonstrate why disciplinary action should not be taken against him (Court File No. 2). The Court having considered Respondent's Response to the Show Cause Order, the evidence adduced at the hearing on the matter, and the post-hearing submissions of Respondent, the Court finds by clear and convincing evidence Respondent has violated the Rules of Professional Conduct as adopted by the Supreme Court of Tennessee and engaged in unethical conduct tending to bring the Court and the Bar into disrepute. Accordingly, the Court **SUSPENDS** Respondent from the bar of the Eastern District of Tennessee for a period of six months commencing on June 15, 2012. Respondent is **ORDERED** to pay all the costs incurred by the court associated with this matter, including the expenses of the investigation, hearing, review, and any costs necessitated by an appeal of this order. Further, the Court **ORDERS** Respondent to forfeit to the Court 25% of any attorney fee award as a sanction for discovery abuse that might be authorized in the underlying litigation of *Scotty Lee*

1

*Thomas v. Lowe's Home Centers, Inc.*, Case No. 3:07-CV-372 ("Thomas," "Thomas Litigation," or "Thomas case"), up to a maximum forfeiture of $25,000. This sanction is a fine, penalty, and forfeiture.

## I. NATURE OF PROCEEDINGS

At the outset it is important to keep in mind this is an attorney discipline matter. It is a matter that goes to a member of the bar of this Court's obligations of candor and honesty to the Court. At bottom, this is a matter of ethical standards and conduct. It is not a criminal prosecution nor is it a civil proceeding. It is fundamentally a matter of whether Respondent has lived up to the ethical and professional standards required of attorneys admitted to the bar of this court. Therefore, what is at the heart of this matter is whether Respondent was candid and honest with the court, that is, United States District Judge Thomas Phillips, in the Thomas litigation. In deciding this issue, the Court has made no effort to determine how much, if any, fee Respondent is due in the Thomas litigation nor what particular claims contained in his petition are supported or unsupported by documentary evidence. That is an issue better left for Judge Phillips to determine in a hearing in that case, where Respondent can present evidence as to what support he has for each time entry in the fee petition. In an open hearing the opposing side will have an opportunity and incentive to challenge the time entries, and Judge Phillips, in the course of determining what monetary award is just, can take into account the evidence and argument presented. Now that this Court determines some of the entries are not supported by documentary evidence and Respondent did not perform all the work claimed, the Court has fulfilled its responsibility and has no need to further evaluate each claimed time entry. It is not the province of this Court to determine what fee, if any, Respondent

is due.

The Court endeavors to make this clear because it struck the Court that many times during the hearing Respondent was expending a great deal of energy attempting to convince the Court he had done "some" work with respect to a particular claimed time entry. This confused the Court because the Court was concerned with whether Respondent had done "all" the work claimed. The Fee Petition asked Judge Phillips to award him monetary relief on the premise Respondent had actually performed "all" work for the times claimed, not that he had performed work for "some" of the time claimed.

## II.    INITIATION OF DISCIPLINARY ACTION

### A.    RECEIPT OF INFORMATION

In May or June, 2011, a judicial officer in this district received a communication from Mr. Gregory Brown, an attorney admitted to the bar of the Eastern District of Tennessee. This communication suggested Respondent had committed violations of the Tennessee Rules of Professional Conduct and engaged in unethical conduct that brought the Court and bar into disrepute. Mr. Brown indicated the possible ethical violations had occurred in connection with Respondent's involvement in the Thomas litigation. In that litigation Respondent filed a Motion for Default Judgment, seeking sanctions for discovery abuse (Thomas, Court File No. 43). Judge Phillips granted the motion in part, holding that the plaintiff would be awarded the attorneys' fees and costs associated with the discovery of a particular witness, a Ms. Sonner (Thomas, Court File No. 81). Judge Phillips set a schedule for Respondent to provide documentation evidencing the fees, expenses, and costs the plaintiff incurred associated with the discovery of the witness, as well as for

3

the defendant to respond to that documentation. On April 8, 2011, the day the documentation was due, Respondent filed a Motion for Additional Time to File Plaintiff's Bill of Costs (Thomas, Court File No. 84), followed on April 11, 2011 by an Amended Motion for Extension of Time to File Plaintiff's Bill of Costs (Thomas, Court File No. 87). To this amended motion, Respondent attached a draft version of the Bill of Costs and Itemization of Fees and Expenses. Next, on April 12, 2011, the parties filed a Joint Motion for Extension of Time to File Plaintiff's Bill of Cost and Itemization of Fees and Expenses (Thomas, Court File No. 90). The assigned Magistrate Judge entered an order granting the extension through April 22, 2011 (Thomas, Court File No 92). Finally, on April 22, 2011, Respondent filed Plaintiff's Revised Itemization of Fees and Costs (Thomas, Court File 93). In the fee petition attached as exhibit A to the Revised Itemization of Fees and Costs, Respondent claimed fees of $300 per hour for himself, $250 per hour for his associates, and $90 per hour for his paralegals. Mr. Benjamin K, a long-time close friend of Respondent, served as a paralegal on the Thomas litigation. Mr. K had submitted bi-weekly invoices to Respondent though a Limited Liability Company ("LLC") known as ████████████ for the time he spent on the case. These invoices contained a narrative description of the work Mr. K had performed for which he had requested compensation.

Mr. Brown represented Mr. K in an unrelated matter and learned about the possible ethical violation from that representation. Mr. Brown reported that based upon his review of the fee petition submitted with the motion for an extension of time (Thomas, Court File No. 87-2) and Mr. K's invoices, Respondent had apparently represented to the court, under penalty of perjury, he had performed work that was, in fact, performed by his paralegal, Mr. K. After reviewing the matter, the judicial officer brought the matter to this Court's attention for review pursuant to E.D. Tenn.

4

L.R. 83.7. In this district the Chief Judge of the district is assigned the responsibility and authority to impose appropriate discipline for violations of the requirements and standards demanded of attorneys admitted to practice in this district pursuant to L.R. 83.7. After reviewing the matter, the Court determined it required further investigation that was beyond the practical ability of the Court to do. Accordingly, pursuant to E.D. Tenn. L.R. 83.7(m), the Court appointed Ms. C. Celeste Creswell to conduct an investigation and make a report to the Court (Court File No. 1).

### B. INVESTIGATION ORDERED

Pursuant to the appointment by the Court, Ms. Creswell conducted an investigation into the possibility Respondent had violated the ethical and professional standards of this Court. A primary goal of the investigation was to ascertain what records Respondent possessed to substantiate the claim in the fee petition in the Scotty Thomas matter. The investigation included reviewing the written materials previously received and reviewed by the Court, interviewing attorney Brown who brought the matter to the attention of the judicial officer, interviewing Mr. Brown's client, Mr. K, reviewing the filings in the underlying Thomas litigation, interviewing Respondent, interviewing other witnesses, obtaining documentary materials from Respondent, issuing subpoenas to Respondent for additional documentary evidence, and other efforts.

In his interview and other interactions with Ms. Creswell, Respondent explained he does most of his work on a contingency fee basis and therefore does not use billing software. However, in the Thomas litigation he decided early in the case to keep track of his time in a Microsoft Word document. According to Respondent he used this time record and the time records of his staff to create the itemization of fees submitted with the fee petition. According to Respondent he converted the contemporaneous time record he had been maintaining into the fee petition submitted to the

5

court. Respondent, however, was unable to locate and produce the original version of the time record, or any other copy or iteration of the contemporaneous time record prior to its purported integration into the master document for the fee petition. In response to a subpoena, Respondent likewise failed to provide the original time document or any copies of that document. Based upon Respondent's answers during the interview and his failure to produce any documents in response to the subpoena, Ms. Creswell justifiably concluded that no other records existed, including the original contemporaneous time records, any copies of the records, or any iterations of the records.

According to Respondent, everyone in the office, himself included, was involved in preparing the fee petition. Respondent followed the principle described in *Chamberlain Mfg. Corp. v. Maremont Corp.*, No. 92-C-0356, 1995 WL 769782 (N.D. Ill. Dec. 29, 1995), under which duplicative or overlapping work between a paralegal and attorney should not be billed for both people; rather, you bill only for the highest rate person working on the task. Consequently, Respondent had employees highlight all duplicative entries and then strike the time of the lower rate billers, in keeping with *Chamberlain*. Respondent did not recall editing the time entries to match the narratives of his staff. He did recall changing some entries to omit work product – for example, some of Mr. K's entries were more generic than Respondent's entries, and Respondent recalled on at least one occasion using Mr. K's entry instead of his own, to protect work product.

In a letter dated July 22, 2011, counsel for Respondent, Lucian Pera, provided further information regarding the investigation. Mr. Pera noted he and Respondent had met with Ms. Creswell on June 28, 2011, at her office. According to Mr. Pera, he and Respondent thought the meeting was productive. Mr. Pera noted he and Respondent "[had] been working diligently to pull together the information and documents you need, even before receiving your subpoena. This letter

and the enclosures are the result. You should also consider the documents included in this submission as partial, if not substantial, compliance with your subpoena."

Mr. Pera also indicated Respondent did personally perform the work and the time reflected in the time entries. Attached to the letter were a number of documents, including a chart depicting "allegedly fraudulent time entries that is designed to allow [Respondent] to respond very specifically to the allegation concerning each of the entries on the chart provided by Mr. K through his counsel." What follows are a sample of entries from the chart provided by Mr. Pera, which demonstrate the remarkable similarities between the verbiage in Mr. K's invoices and that used by Respondent in the fee petition[1]:

| Date | K's Invoices | Justice's Fee Petition |
| --- | --- | --- |
| 5/14/09 | Review of Juliane Morris initial draft Complaint. Extensive written comments and memo. | Initial draft of amended complaint. |
| 6/08/09 | Motion to Compel. Complete Review and overhaul of Juliane's work | Motion to Compel: Complete draft and then refinement. |
| 6/12/09 | Motion to Have Requests for Admission Deemed Admitted. Reviewed Draft prepared by Juliane Morris. Researched case law related to necessary "reasonable inquiry" under rule 36(a)(4). | Worked on Motions to Have Request for Admission Deemed Admitted.

Researched case law related to necessary "reasonable inquiry" under rule 36(a)(4). |
| 6/13/09 | Revision of Motion to Have Requests for Admission | Revision of Motion to Have Requests for Admission |

[1]The full chart is attached as an appendix to this memorandum and order. It includes an additional column giving Respondent's description of the circumstances of the entries.

7

|  |  |  |
|---|---|---|
|  | Deemed Admitted. | Deemed Admitted. |
| 6/14/09 | Added Loring edits to Motion to Deem Requests for Admissions admitted. Added Section about Letter to Clint Woodfin and Motion to Supplement. Researched Electronic filing rules for the E.D. Tenn. | Edits to Motion to Deem Requests for Admission Admitted. Added section about letter to Clint Woodfin and Motion to Supplement. Researched electronic filing rules for the E.D. Tenn. |
| 6/16/09 | All final preparations of Amended Complaint and Motion to Deem Requests for Admission Deemed Admitted. Preparations of all PDF exhibits. Compilation of files. Filing with the E.D. Tenn via ECF. Hard Copies of everything for file. | All final preparations of Amended Complaint and Motion to Deem Requests for Admissions Deemed Admitted. Preparations of all PDF exhibits. Compilation of files. Filing with the E.D. Tenn via ECF. Hard Copies for everything for file. |
| 6/17/09 | Talked to Angela Brush at district court to correct misunderstanding re our filings. Second conversation with LJ about Consent Motion to Amend with Clint Woodfin. Drafted Consent Motion for review by Clint Woodfin. | Talked to Angela Brush at district court to correct misunderstandings re our filings. |
| 6/19/09 | Letter to Bob Davies re additional materials needed from MSG. | Letter to Bob Davies regarding additional materials need from MSG about the project |
| 7/16/09 | Reviewed Loring's notes from meeting with Clint Woodfin and calendared follow-up call to Cory re: Clint's call. | Reviewed notes from meeting with Clint Woodfin and calendared follow-up call to Corey Kitchen re: Clint's call. |
| 7/27/09 | Reviewed all notes from our trip to Alabama and compiled Master to Do List for Loring | Reviewed all notes from our trip to Alabama to meet with the MSG witnesses and |

8

| | | |
|---|---|---|
| | and GB. Drafted Affidavits of Kitchen, Yeates, and McBride Online research re: Teresa Beavers (Lowe's Manager) | compiled Master To-Do List. Drafted affidavits of Kitchen, Yeates, and McBride. Online research re: Teresa Beavers (Lowe's Manager) |
| 7/29/09 | Revisions of Affidavits of Kitchen, Yeates, and McBride | Revisions of Affidavits of Kitchen, Yeates, and McBride |
| 8/8/09 | Coordinated with Debi Dean to make sure that Randy, Bradley and Corey will sign Affidavits and get them back to us notarized. Prepared final versions with LJ edits. ███████ ████████████████ ██████████ Researched FRCP and EDTN Rules re: timeliness of Notice of Filing with respect to Hearing Date. Drafted Notice of Filing. Drafted Memorandum to accompany Notice of Filing for filing with the Court this week. | Coordinated with Debi Dean of Alabama Head Injury Foundation to make sure that Randy, Bradley, and Corey will sign affidavits and get them back to us notarized. Reviewed legal assistant's research of FRCP and EDTN Rules re: timeliness of Notice of Filing with respect to Hearing Date. Drafted Notice of Filing. Drafted Memorandum to accompany Notice of Filing for filing with the Court this week. |
| 8/10/09 | Coordination of all Affidavit signing, etc. with Debi Dean. | Coordination of all Affidavit signing, etc. with Debi Dean. |
| 8/31/09 | Prepared outline for Loring as to action plan before September 14 hearing, Researched Lowe's Loss/Safety Prevention Manager. Drafted proposed interrogatory re; information on who held that position at the time of the accident. Revised and prepared cover letters to Clint Woodfin and | Prepared outline as to action plan before September 14 hearing. Researched Lowe's Loss/Safety Prevention Manager. Drafted proposed interrogatory re: information on who held that position at the time of the accident. Revised and prepared cover letters of Clint Woodfin and Clerk's office. |

9

Clerk's office.

Due to the striking similarity in language between Mr. K's invoices and Respondent's fee petition, it seemed probable to Ms. Creswell that Respondent had prepared at least part of the fee petition by copying from Mr. K's invoices, and not by copying from his own contemporaneous time record, as he claimed. Moreover, Respondent's April 11, 2011 draft of the fee petition contained several entries – billed as his work – which referred to Respondent in the third person. For example, the 7/25/09 entry said "Met with entire group and Loring" (Thomas, Court File No. 87-2, p. 6). The 7/27/09 entry said "compiled Master To-Do List for Loring" (Thomas, Court File No. 87-2, p. 6). Although Respondent removed these third-person references in the final fee petition filed April 22, 2011, their initial inclusion in the draft petition suggested Respondent had copied the entries from someone else's time records. Additionally, one third-person reference to Respondent actually survived to the final fee petition. Both the draft fee petition and the final fee petition contain a 10/15/10 entry which says: "E-mail to LJ re: notice of electronic filing of subpoena returned Executed" (Thomas, Court File Nos. 87-2, p. 18; 93-1, p. 20). This time entry is billed as work Respondent performed. This entry appeared to be copied from someone else's time records,[2] given its reference to Respondent in the third person, and the fact that one would not typically be expected to be sending e-mails to oneself.

It was evident to Ms. Creswell during the course of the investigation that being able to ascertain whether Respondent actually maintained a contemporaneous time record was of critical importance to the investigation and to the Court in determining whether an ethical violation had

_____

[2]It could not have been copied from Mr. K's invoices, because Mr. K did not submit an invoice containing that entry.

10

been committed. Tr. Vol. II, pp. 69 & 70.[3] Upon her request for copies of the time record before it was converted to the fee petition, she was told no such record could be located. In response to a subpoena for the same information, she again was told the records could not be located. When she offered to have a computer forensic expert review the several computers upon which the records were supposedly maintained, Respondent refused to allow the examination. All of her many efforts to verify Respondent had maintained records of his personal work on the Thomas litigation as claimed in the fee petition were unavailing. Following her investigation, Ms. Creswell reported to the Court she had been unable to verify that Respondent had maintained a record of work he claimed to have personally performed, that the evidence strongly suggested Respondent had copied work listed in Mr. K's invoices as work he had performed on the fee petition, and that some of the claimed fees appeared to be false.

## C.    THE SHOW CAUSE ORDER

On September 26, 2011 the Court issued a Show Cause Order pursuant to E.D. Tenn. L.R. 83.7(b) (Court File No. 2). The Show Cause Order contained a section setting out the Court's understanding of the underlying facts in a section labeled "Factual Allegations," which provided:

> On September 10, 2007, Loring Justice ("Respondent") filed a Complaint on behalf of his client, Scotty Lee Thomas, against Lowe's Home Centers, Inc. in Tennessee state court. The defendant removed the case to the Knoxville Division of this District on September 25, 2007, as *Scotty Lee Thomas v. Lowe's Home Centers, Inc.*, Case No. 3:07-CV-372. Respondent subsequently filed a Motion for Default Judgment in Thomas, seeking sanctions for discovery abuse. The district judge granted the motion in part, holding Respondent would be awarded attorneys' fees and costs associated with the discovery of a particular witness. The district judge set a

---

[3]The hearing transcripts comprise four volumes, referred to herein as "Tr." followed by the volume number.

11

schedule for Respondent to provide documentation evidencing the fees, expenses, and costs incurred with respect to the discovery of the witness.

On April 8, 2011, the day the documentation was due, Respondent filed a motion for additional time to file the bill of costs, and attached a draft bill of costs and itemization of fees. On April 11, 2011, he filed an amended motion for an extension of time, and attached an amended bill of costs. On April 12, 2011, the parties filed a joint motion for extension of time. The magistrate judge entered an order granting an extension through April 22, 2011. On that date, Respondent filed a final revised fee petition. This document claimed $106,302.00 in fees, $97,650.00 of which was attributed to hours billed by Respondent personally, the remainder by Respondent's associates.

In submitting this fee petition to the court, Respondent was representing that the petition was accurate and reflected work he had personally performed, save for that attributed to his associates. Contrary to that representation, however, it appears the fee application wrongly attributes to Respondent work actually performed by his contract paralegal, Benjamin K. Respondent essentially transposed Mr. K's time entries onto his fee petition, thereby intentionally and falsely claiming the work as his own. By this mechanism Respondent inflated the amount of the claim and stood to personally benefit financially. Through his knowing submission of a false and inflated fee petition, Respondent has called into question his fitness to be a member of the bar of this court and has hindered the due administration of justice.

(Court File No. 2, pp. 1-2).

The Show Cause Order went on to set out the Unprofessional and Unethical Behavior that appeared to have resulted from the factual allegations in the Order. Among the list of ethical standards implicated, the Order stated: "It also appears Respondent, in submitting this fee petition to the court, falsely certified to the court that the petition had evidentiary support and was not submitted for an improper purpose" (Court File No. 2, p. 3).

Additionally, it appeared that if the allegations were correct, Respondent had violated a number of the Tennessee Rules of Professional Conduct. First, Respondent would have failed to demonstrate the degree of competence expected of attorneys admitted to the bar of the Eastern District of Tennessee, which in turn would run afoul of Rule 1.1 of the Tennessee Rules of

12

Professional Conduct: "A lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness, and preparation reasonably necessary for the representation."

Likewise, if the allegations were correct then Respondent, in representing he had maintained records of the time claimed in the fee petition when he did not, would have run afoul of Rule 3.3 of the Tennessee Rules of Professional Conduct: "(a) A lawyer shall not knowingly (1) make a false statement of fact or law to a tribunal . . . (b) A lawyer shall not offer evidence the lawyer knows to be false . . . ." Finally, if the allegations were correct it would suggest Respondent's actions reflected adversely upon his honesty, trustworthiness, and fitness as an attorney; involved dishonesty, fraud, deceit, or misrepresentation; and would be prejudicial to the administration of justice. This would all violate Rule 8.4 of the Tennessee Rules of Professional Conduct:

It is professional misconduct for a lawyer to:

(a) violate or attempt to violate the Rules of Professional Conduct . . .

(b) commit a criminal act that reflects adversely on the lawyer's honesty trustworthiness, or fitness as a lawyer in other respects;

(c) engage in conduct involving dishonesty, fraud, deceit, or misrepresentation;

(d) engage in conduct that is prejudicial to the administration of justice . . . .

## III.    RESPONDENT'S RESPONSE

On October 17, 2011 Respondent filed his Response of Loring Justice to Show Cause Order (Court File No. 5). In this response Respondent denied the allegations in the Show Cause Order. He stated he had personally worked all the time reflected in the time entries shown in the fee petition, that he did not intentionally or deliberately attribute the work of Mr. K to himself, that he

13

had not substantially adopted the time entries and descriptions of work contained in Mr. K's records and invoices rather than relying on his own time records, that he did not demonstrate incompetence and lack of the necessary skill to practice in this court, and that in submitting the fee petition he did not commit a criminal act that reflects adversely on his honesty, trustworthiness, or fitness as a lawyer. He also specifically requested a hearing on the allegations. Further, Respondent also denied "that his conduct in connection with the submission of a fee petition in the Thomas case was in violation of any ethics rule." Included with his response, Respondent attached letters to Ms. Creswell and documents produced in response to the Court's subpoena.

## IV.    THE DISCIPLINARY HEARING

### A.    PRE-HEARING CONFERENCE

On November 22, 2011, the Court held a pre-hearing conference via telephone with Respondent's counsel, Lucian Pera. The conference covered the following topics: the time and date of the hearing; the confidentiality of the hearing, exhibits, and court filings; the role of Ms. Creswell; the nature of any discovery; the types of evidence that could be presented; and other logistics of the hearing. The Court provided Mr. Pera an opportunity to ask questions regarding the conduct of the hearing and the procedures that would be in place during the hearing. The Court also ascertained that Mr. Pera was familiar with the applicable and relevant case law pertaining to a disciplinary hearing in federal district court.

### B.    THE HEARING

From February 17, 2012 to February 23, 2012, the Court held the requested hearing.[4] During the hearing the Court heard testimony from Respondent and Benjamin K. Respondent was represented by Mr. Pera. Ms. Creswell acted as an agent of the Court in examining witnesses, marshaling exhibits and evidence, and aiding the Court. The Court also received into the record of the hearing a number of exhibits including affidavits and declarations of: Yalkin Demirkaya, computer forensic specialist; Chad Rickman, associate of Respondent; David Smith, a forensic Audio Examiner; Scotty Lee Thomas; Caroline Vaughn, legal assistant of Respondent; Kristin Blankenship, legal assistant of Respondent; Debi Dean; Bradley Yeates; Randy Lee McBride; Corey Kitchen; Heidi Heckel; Chris Rose; and Dr. Edward A. Workman, M.D. Because these individuals did not testify at the hearing and the Court had no opportunity to observe their demeanor, see their reaction to questions, or test their testimony through cross-examination, the Court accords less weight to the statements of these individuals than the testimony of Respondent and Mr. K. After the hearing Respondent filed a motion to exclude Mr. K's testimony, along with various associated affidavits and declarations (Court File No. 17), and his Post-Hearing Brief (Court File No. 18). As an exhibit to that brief Respondent attached the Second Expert Opinion Testimony of Yalkin Demirkaya. With respect to affidavits, declarations, and opinions filed after the hearing, the Court for the same reason accords these statements less weight. To the extent these later statements confine themselves to matters brought up at the hearing and Respondent could not have reasonably been expected to anticipate the matter, the Court will consider the statements. To the extent these

---

[4]At Respondent's request, the Court conducted the entire hearing in a closed setting. Respondent expressed a desire that the allegations not be public, and stated there might be privileged materials disclosed or introduced as evidence at the hearing. Finding there was merit to Respondent's request, the Court ordered that the hearing be conducted in a closed setting and all evidence and records pertaining to the hearing be sealed.

later statements address matters that could have been anticipated to have been addressed at the hearing, the Court will not consider them.

## V.  THE COURT'S CONCLUSIONS

A.  The Court's role in disciplinary matters where a hearing has been conducted is to act as the finder of fact as well as the judge of legal issues.  As fact finder the Court makes certain credibility determinations.  The most important basis of the Court's determinations is the testimony of Respondent, the content of his testimony, his manner of testimony, and his demeanor.  All other witnesses are of secondary relevance, at most, in the Court's findings of fact.  Based upon the Court's role as fact finder the Court makes the following findings:

1.  Respondent was a top graduate of the University of Tennessee and upon his graduation attended Yale Law School.

2.  Benjamin K was a top graduate of ███████████████ and upon his graduation attended Yale Law School.

3.  While at Yale Law School, Respondent and Benjamin K became close friends.  ("[Ben K is] a very, very good friend of mine whom I have known since my first days of law school. . . . Ben K was historically just a really, really good friend of mine.  I went to law school with him, kept up with him after law school, and was one of – I would consider him one of my closest friends in the world.") Tr. Vol. I, pp. 104 & 106.  They discovered they shared a host of common interests and enjoyed mutual affection and respect

16

for each other. Tr. Vol. I, pp. 105-08; Tr. Vol. III, pp. 25-31.

4.     Upon graduation from Yale Law School, Respondent secured a judicial law clerkship with United States Court of Appeals for the Sixth Circuit Judge Gilbert S. Merritt.

5.     When Judge Merritt found he needed an additional judicial law clerk, Respondent recommended to Judge Merritt his close friend, Mr. K, for the position.  Respondent made this recommendation because of his respect for Mr. K's intellect, honesty, truthfulness, high moral character, dependability, stability, and discretion, all necessary traits in a federal judicial law clerk. Tr. Vol. III, pp. 25-31.

6.     While serving as judicial law clerks for Judge Merritt, both Respondent and Mr. K performed their duties well.

7.     Following their clerkship, they maintained their close friendship and affection and mutual respect for each other.

8.     Respondent took and passed the Tennessee bar examination and was licensed to practice law in Tennessee.

9.     Mr. K took the South Carolina bar examination but failed the examination and has never been licensed to practice law in any state.

10.    After practicing with a law firm for a short period of time, Respondent opened his own practice and soon developed a very active practice of law involving a variety of legal matters, including clients from his hometown of Oak Ridge, Tennessee who had Workers' Compensation claims.

17

11.     Additionally, Respondent had a consultancy business with ████████ ███████████████████████████████████ where he served as a ██████████████ for this investment advice company. He provided expert advice to ████ clients in relation to complex legal and economic situations. This work occupied much of his time – as much as a quarter to a third of his time before the recession. Tr. Vol. I, p. 235. He earned $550 per hour for his work with ████ Tr. Vol. II, p. 32.

12.     At the time Respondent filed his Fee Petition in the Thomas litigation, Respondent had over 12 years of experience and had received professional distinction.

13.     At the time Respondent undertook the Thomas litigation he was extremely busy with other legal matters in his law practice and also some other business matters. He remained busy with both other legal matters and business matters throughout the entire time of the work claimed in the fee petition. Tr. Vol. II, p. 15. ("I did tell the clerical staff, but there was a lot of turnover there, okay, and they weren't always good about doing it and that's why you don't see a lot of their time in the petition, but I could not be upset with them because of the nature of our practice which was by representing these folks out at Oak Ridge under sort of these new laws that have come into effect to govern those workers. We were sort of – they were overworked, my staff was. Right? We were overwhelmed. We needed help. I wasn't particularly punitive for anybody making any kind of mistake.") Tr. Vol. III, pp. 167-68.

14. Respondent hired other associates and staff to assist him with his work so that he could devote his time to the more pressing and important matters in his practice.

15. Because of his need for assistance Respondent brought his close, long-time friend Mr. K on board as a contract employee. He made this decision in large part because of the confidence he had in Mr. K's abilities, honesty, intelligence, and character. Tr. Vol. III, pp. 29-31.

16. Respondent and Mr. K worked very closely together on the Thomas matter. (Q. "I'd like you to tell the Court about little [sic] about the extent of your work together with your paralegal, Mr. Ben K, on the Scotty Thomas case. So just start – start this way. How closely were you and Mr. K working in 2009?" A. "I don't know how to describe it. It just – I don't see how a paralegal and a lawyer can be closer (as stated) – any more closely aligned. And if I may, I've known Ben K since law school, good friend for years.") Tr. Vol. I, p. 85.

17. Although Mr. K served Respondent as a paralegal, because of Mr. K's training as an attorney and innate abilities, Respondent relied upon Mr. K's legal training and abilities to an extent one would not normally rely upon a paralegal. For example in the time entry for August 17, 2009 in the fee petition Respondent wrote: "Presented my planned discovery motion hearing arguments to Ben K and was mooted by him, discussed positives and negatives of my arguments; refined arguments and case analysis before

19

tomorrow's discovery hearing in light of moot session with K" (Thomas, Court File No. 93-1, p.8).

18.     Mr. K submitted invoices to Respondent every two weeks, and on the invoices would provide a description of the work he had performed during that time period.  (Q.  "And Mr. K's the next one to come in.  And Mr. K is somewhat different because he was billing you in invoices what, every two weeks or once a month?"  A.  "Every two weeks I think, your Honor.")  Tr. Vol. III, p. 169.

19.     Although Mr. K did some work on other matters, he primarily worked on the Thomas litigation.  Respondent had Mr. K work on the Thomas litigation because it was one of the more pressing cases in his office and he had complete confidence in Mr. K's intellectual prowess, talent, integrity, diligence and honesty.  He desired and trusted Mr. K to work on the case because Respondent was not able to devote the time and attention to the case he thought it deserved.  He thought Mr. K would do as able a job on the case as he would.

20.     Respondent did not in fact maintain a contemporaneous record of his time in the Thomas litigation because he undertook this case on a contingency basis and it was not his practice to maintain time records.  Tr. Vol. I, pp. 39-41. Respondent had never filed for reimbursement of fees as a sanction for discovery abuse previously.  Tr. Vol. I, pp. 38-39.  This finding of fact explains why, while Respondent says the contemporaneous time record was

20

compiled over a period of many months on his office and home computers and on a flash drive, Tr. Vol. III, pp. 164-217, not a single copy of the record, whether in paper or digital format, was produced to Ms. Creswell during her investigation or at the hearing. It also explains why Respondent did not provide a copy of the document in response to the subpoena issued by the Court during the investigation. It also explains why Respondent refused Ms. Creswell's request to allow a computer forensic expert to examine the several computers upon which the time records were supposedly maintained to attempt to locate copies of the record even if they had been deleted. Computer hard drives are such that it is sometimes possible to retrieve even a deleted document. Where we have multiple iterations of the document on several different computers, the chances of retrieving such a document should be increased. It also explains why Respondent does not recall having specific conversations with his secretary Kristin Blankenship, Tr. Vol. III, pp. 165-66; his associate Juliane Morris, Tr. Vol. III, pp. 170-73; Wendy Rogers, Tr. Vol. III, pp. 173-74; Shannon Johnson, Tr. Vol. III, pp. 174-76; his associate Wilson Ven Kessler, Tr. Vol. III, pp. 176-80; Caroline Vaughn, Tr. Vol. III, pp. 197-99; Pam Boogan, Tr. Vol. III, pp. 202-04; and Cindy Meyers, Tr. Vol. III, pp. 204-07, instructing them to maintain accurate contemporaneous time records on the Thomas litigation. It also explains why Respondent did not check to see if Chad Rickman was keeping detailed and accurate time records from the fall of 2010 until Respondent started working on the fee petition in March 2011. Tr. Vol. III, p. 191. It also explains why

21

at the hearing Respondent could not even recall the name of the supposed contemporaneous time record he maintained he was keeping on his computers and had worked on over many months on several computers, both at his home and at his office.  Tr. Vol. III, pp. 221-22.

21.    While Respondent did obviously perform considerable work that led to the fee petition, Respondent had no credible record of exactly what he had done, when he had done the work, the specific amount of time he had spent on the particular work, or whether he had actually worked on a particular matter.

22.    Respondent was given a deadline of April 8, 2011 by Judge Thomas Phillips to "provide documentation evidencing the fees, expenses, and costs incurred, associated with the discovery of Ms. Sonner."  This order was issued on March 15, 2011 (Thomas, Court File No. 81).

23.    Because Respondent had not maintained a contemporaneous record of his time spent on the Thomas matter, Respondent found it was impossible to comply with Judge Phillips' order that he provide documentation of his time by April 8, 2011.  His efforts to re-create his time did not allow him to submit anything to the court by that date.  He therefore moved for an extension of seven additional days to file his bill of costs (Thomas, Court File No. 84).  In his motion for an extension he represented:

> Despite diligent efforts of Plaintiff's counsel made in good faith, the Plaintiff has not yet been able to complete compilation of all documentation evidencing the fees, expenses, and costs incurred associated with the discovery of Ms. Sonner.  This is the result of a number of factors, including the length of the litigation, the volume of work conducted in regard to these issues over a protracted period, and the fact that this matter was not initially billed on an hourly basis,

22

as well as the demands of other pending matters on Plaintiff counsel's calendar.

24. Respondent's other demands did not allow him time to devote to re-creating the time he had spent on the Thomas litigation. ("We were getting ready for trial of a medical malpractice case. We were – I was working a great deal with an anesthesiologist expert witness to understand a pretty complex disease process that's called complex regional pain syndrome, and he was helping educate me on that because I had a trial. We were gathering material to respond to summary judgment in another premises case involving toxic mold. There were – I mean, there were – frankly, there were numerous things because of – you know, my hometown was a bedroom – Coalfield's my hometown and Oliver Springs, a bedroom community to Oak Ridge – and orient it to a time now where they're screening all those gentleman who've had – and ladies who've had historical exposures, so – and, you know, I know a lot of them, frankly. And so, our business has been overwhelmed for a while in helping those folks. And we – we work hard. And there's folks coming in on those issues and saying, you know, I've been – I've got a letter, I've got information indicating I've been exposed to too much radiation, this is what caused my cancer or caused my husband to pass, can you help me. Things like that were happening." Q. "So is it fair to say during that three-week period there was other – there were other things going on other than this fee application that you needed to get out, right?" A. "Oh, yes.") Tr. Vol. I, pp. 64-65. When faced with the necessity of submitting detailed

23

time records to support the fee petition, Respondent tried to re-create a time record after the fact. This required Respondent to go through his calendars, his records in the case, and the records of his staff. This explains the explosion of work he and his staff did at the time the fee petition was due to be filed and why the extension was sought.

25. Respondent and his staff worked into the night trying to re-create the time he had spent on the Thomas litigation. ("We filed a motion for extension, because I didn't feel like – and we tried. I think I kept everyone there till 11:00 p.m. or something around it or something, or very late, you know, because we were trying to get it done. But I just felt like we could not get done to that level that it ought to be done. . . . So I asked Chad and perhaps – my associate attorney, Chad Rickman, and perhaps Caroline, my legal assistant at that time, to come in over the weekend so that perhaps – because it was proving to be much more difficult than I had previously anticipated – to come over the weekend and get something together so perhaps that by the time someone would open their inbox on Monday morning – with absolutely no prejudice given that the deadline was on Friday and there was an intervening weekend – you know, we could say before anybody could possibly be prejudiced, we got it done.") Tr. Vol. I, pp. 66-68.

26. Although Respondent did not have a contemporaneous time record of his time, he did have available Mr. K's invoices that contained a narrative description of the work Mr. K had performed on the Thomas matter. These invoices provided a contemporaneous and comprehensive record of Mr. K's

24

work on the Thomas litigation.

27.     Respondent therefore decided to use Mr. K's invoice narrative descriptions in the fee petition since he did not have a contemporaneous record of his own, and attribute to himself much of the work Mr. K had performed and for which he had billed Respondent, regardless of whether Respondent had done any work on the particular matter or not.

28.     In doing this Respondent would be claiming $300 per hour as opposed to the $90 per hour that he could obtain for Mr. K's work. Respondent realized that in some instances it would not be plausible for him to claim the same hours for work Mr. K had done for such things as "Googling" a name, collating files, compiling exhibits, and the like, so he reduced the time Mr. K had claimed to make it appear plausible. For example, for the entry for June 26, 2009, while Mr. K claimed 0.5 hours for "Entered final LJ revisions to Motion to Compel. Compiled exhibits in PDF format," Respondent claimed 0.3 hours for "Compiled exhibits to Motion to Compel in PDF format with assistance of legal assistant" (See Appendix). Respondent realized it was not plausible that a busy experienced attorney with other demands on his time would be spending this much time with his assistants preparing exhibits.

29.     In copying Mr. K's time entries and making them his own when he had no documentation that he had done the work claimed, Respondent was not acting for a client but rather for his own pecuniary gain; that is, any award of fees and expenses ordered by Judge Phillips would go to him personally and not to his client.

30. If it were not obvious enough Respondent copied from Mr. K's invoices in preparing the fee petition simply by looking at the similarity in language between the documents, the several third-person references to Respondent included in the draft petition make the conclusion unavoidable.

31. Additionally, the third-person reference to Respondent in the 10/15/10 entry of the final fee petition, which states "E-mail to LJ re: notice of electronic filing of subpoena returned Executed," reveals Respondent copied from at least one other person's time records, since this was not an item on Mr. K's invoices.

32. Because his own personal financial gain was involved, Respondent had an even higher obligation to be candid and truthful to the court.

33. In preparing the fee petition after Judge Phillips' order granting an extension, Respondent generated or caused to be generated the four iterations of the fee petition introduced into the record of the hearing: the fee petition filed in the Thomas litigation (Thomas, Court File No. 93-1), and Hearing Exhibits 4-6, all apparently drafts generated at different times on April 22, 2011.

34. Respondent also had a great deal of other demands upon him from his practice which took a considerable amount of this time. In Respondent's "Plaintiff's Amended Motion for Extension of Time to Submit Plaintiff's Bill of Costs and Itemization of Fees and expenses and Motion for Leave to Substitute Previously Filed Documents" (Thomas, Court File No. 87, pp. 3-4), Respondent represented the following:

   a. During the period allotted by the Court to compile and provide the

26

requested fee and expense information Plaintiff's counsel missed three full days and most of a fourth day due to personal illness. Plaintiff's counsel also missed the majority of another day within the period due to an illness of his son.

b.  Plaintiff's counsel would have begun work on compiling the requested information on March 16, 2011 the first day of the period, but was unable to do so, as the deposition of Ms. Teresa Beavers, one of the most important witnesses in this case, took the majority of that day.

c.  On April 6, 2010, counsel for Plaintiff and Defendant had a lengthy meeting to discuss discovery issues in the case and Defendant's Answer to the Amended Complaint, as well as the logistics of both in-state and out-of-state depositions.

d.  Certain former employees of Plaintiff's counsel did not place important expense documents such as hotel and other travel receipts relevant to the fee and expenses shifting issues in Plaintiff's expense file. Therefore, receipts had to be obtained from the vendors directly in order to dispositively document the expenses.

e.  On March 29, 2010, the Tennessee Supreme Court issued its opinion in *David Wright Ex Rel. Kaitlyn Wright v. Anita Wright et al.* This twenty-six (26) page opinion methodically addressed reasonable attorney fees in this area. In light of *Wright*, Plaintiffs counsel was required to make substantial changes to Plaintiffs petition for fees and expenses.

f.  The Plaintiff is working to meet the rapidly approaching April 30, 2011 deadline for expert disclosure in this case.  In doing so, Plaintiff's counsel is working with Plaintiff's treating physicians who are far away in Alabama, as is the Plaintiff. One of the most important treating physicians has moved her practice to Kansas. Therefore, Plaintiff's counsel is working with and trying to appropriately disclose a physician in Kansas. Plaintiff's counsel was working on these disclosures during the time period.

g.  Plaintiff's counsel is the attorney for the estate and family of the decedent in an upcoming asbestos-related trial involving death by mesothelioma.  This matter, set for trial on May 16, 2010, has imposed significant demands on Plaintiff's counsel during the period.

h.  Plaintiff's counsel has a medical malpractice case set for trial on June 20, 2010.  Several depositions in that matter had to be taken within the time period afforded the Plaintiff to provide fee and expenses information in this cause.

i.  During the period, Plaintiff had new matters come into his office that were very near the applicable Tennessee one-year statute of limitations and required immediate work and filing.

j.  Plaintiff's counsel had a case set for trial in Scott County on March 29, 2010, in which a settlement was reached on March 25, 2010, after

27

much of the trial preparation had been completed during the time period.

k.  On March 31, 2010, Plaintiff's counsel was required to be out of his office for a real estate closing involving property in which he held an economic interest.

l.  Late in the process and near the time that Plaintiff's Itemization of Fees and Costs was to be filed, Plaintiff's counsel realized that substantial editing and revision of time entries was required as descriptions in the entries contained information subject to the attorney-work-product privilege and otherwise contained case-sensitive information that should not be disclosed in an ongoing litigation.

35.  Also in Exhibit 1 attached to this motion, "Plaintiff's Bill of Costs and Itemization of Fees and expenses," Respondent represented "[Respondent] submits this bill of costs and application for the legal fees, costs and expenses that he has 'incurred in locating and deposing Ms. Sonner" and "Exhibit A contains the legal fees attributable to the Plaintiff's search for a Lowe's related witness with knowledge of the incident which injured Mr. Thomas. The information relating to the fees of Loring Justice, PLLC (Exh. A) is taken from records [of] Loring Justice, PLLC with unrelated billings removed" (Thomas, Court File No. 87-1, pp. 1-2).

36.  In Exhibit A to this pleading, Respondent included an itemized accounting of services for himself and members of his staff. This itemization claims fees of $103,395 (Thomas, Court File No. 87-2).

37.  In Exhibit B to this pleading, Respondent included a declaration submitted under penalty of perjury. Paragraph 14 of that declaration states: "Loring Justice, PLLC maintained records for the work performed on behalf of the Plaintiff" (Thomas, Court File No. 87-3, ¶ 14).

28

38.     In paragraph 21 of this declaration, Respondent also stated under penalty of
perjury: "To the best of my knowledge, information and belief, the facts and
assertions in all the documents related to the Plaintiff's Bill of Costs and
Itemization of Fees and Expenses are true and correct" (Thomas, Court File
No. 87-3, ¶ 21).

39.     In the work-in-progress draft of the fee petition attached to his April 11, 2011
amended motion for extension, Respondent, in copying the narrative
description from Mr. K's invoice for the July 25, 2009 entry, failed to alter
Mr. K's third-person reference to Respondent, so the entry submitted to the
court reads: "Interviewed . . . Randy Lee McBride.  Met with entire group
*and Loring*" (emphasis added) (Thomas, Court File No. 87-2, p. 6).
Similarly, the July 27, 2009 entry submitted to the Court as Respondent's
own work reads: "compiled Master To-Do List *for Loring* and B. Griffith"
(emphasis added) (Thomas, Court File No. 87-2, p. 6).  Likewise, the
October 15, 2010 entry on this document reads: "E-mail *to LJ* re: notice of
electronic filing of subpoena returned Executed" (Thomas, Court File No.
87-2, p. 18).[5]

40.     In the April 11, 2011 draft of the fee petition, Respondent claimed that on
June 17, 2009  he had spent an hour on the telephone talking to Deputy Clerk
of Court Angela Brush (Thomas, Court File No. 87-2, p. 3).

41.     In Mr. K's invoices he claimed that on June 17, 2009 he had spent an hour

---

[5]The first two of these third-person references to Respondent were removed in the final fee petition
submitted April 22, 2010; the third one was not (Court File No. 93-1, p. 20).

on the telephone talking to Deputy Clerk of Court Angela Brush.

42.     In his April 11, 2011 filing, Respondent failed to inform Judge Thomas Phillips that he had not maintained a contemporaneous time record of the time spent on the Thomas matter, that he had no documentation to support the time claimed in the fee petition, and that some of the times claimed were re-creations and/or estimates.

43.     On April 22, 2011, Respondent filed his "Plaintiff's Revised Itemization of Fees and Expenses (Thomas, Court File No. 93). In this filing Respondent stated he "submits this revised evidence of time expended with accompanying affidavits and documentary evidence and respectfully makes application for the legal fees, costs and expenses that he has 'incurred in locating and deposing Ms. Sonner," and that "Exhibit A contains the legal fees attributable to the Plaintiff's search for a Lowe's related witness with knowledge of the incident which injured Mr. Thomas. The information relating to the fees of Loring Justice, PLLC (Ex. A) is taken from records [of] Loring Justice, PLLC with unrelated billings removed" (Thomas, Court File No. 93, pp. 1 & 3).

44.     In Exhibit A to this pleading, Respondent included an itemized accounting of service for himself and members of his staff. This itemization claims fees of $106,302 (Thomas, Court File No. 93-1).

45.     In Exhibit B to this pleading, Respondent included a declaration submitted under penalty of perjury. Paragraph 14 of that declaration states: "Loring Justice, PLLC maintained records for the work performed on behalf of the

30

Plaintiff" (Thomas, Court File No. 93-2, ¶ 14).

46.    In paragraph 21 of this declaration, Respondent also stated under penalty of perjury: "To the best of my knowledge, information and belief, the facts and assertions in all the documents related to the Plaintiff's Bill of Costs and Itemization of Fees and Expenses are true and correct" (Thomas, Court File No. 93-2, ¶ 21).

47.    In the April 22, 2011 final fee petition, Respondent claimed that on June 17, 2009 he had spent an hour on the telephone talking to Deputy Clerk of Court Angela Brush (Thomas, Court File No. 93-1, p. 4).

48.    Similarly, in Mr. K's invoices he claimed that on June 17, 2009 he had spent an hour on the telephone talking to Deputy Clerk of Court Angela Brush to correct a misunderstanding regarding one of their filings.

49.    On June 17, 2009, Mr. K had sent an email to Respondent that explained in detail the misunderstanding that had taken place regarding the filing, and described to Respondent Mr. K's conversation earlier that day with Angela Brush (Hearing Ex. 28).

50.    Respondent responded to Mr. K's email by saying: "Wonderful brother, thank you so much; . . . I guess Judge Phillips is sitting in by designation; that's nice; for a Republican, he's a really great guy; projects went great today . . . look forward to sitting down with you and chatting with you about it soon." Tr. Vol. 4, p. 167.

51.    In his final fee petition of April 22, 2011, Respondent failed to inform Judge Thomas Phillips that he had not maintained a contemporaneous time record

31

of the time spent on the Thomas matter, that he had no documentation to support the time claimed in the fee petition, and that some of the times claimed were re-creations and/or estimates.

52. Nor did Respondent tell Judge Phillips that he had copied almost verbatim the time entries of Mr. K and included them as work he had done.

53. In submitting this request for fees and costs, Respondent was providing claims not based upon contemporaneously maintained time records, but his best re-creation and estimates of the time he had spent on the Thomas matter. However, his best re-creation and estimates were not reliable and accurate records of time spent.

54. On May 6, 2011, after Respondent had filed the fee petition, the defendant in the Thomas litigation filed its Response and Objection to Plaintiff's Revised Itemization of Fees and Expenses (Thomas, Court File No. 94). In this Response and Objection, the defense questioned some of the items claimed by Respondent. Among the items questioned was the one hour telephone call Respondent claimed he had with Angela Brush on June 17, 2009. (Thomas, Court File No. 94, p. 22).

55. In responding to the defense challenge, Respondent on May 13, 2011 addressed the unlikelihood that an experienced attorney would spend an hour on the telephone with a deputy clerk. Respondent, whose claim in the fee petition allegedly was based upon documentation, stated: "In addressing fees and costs included in Plaintiff's itemization, the Plaintiff concedes that the time entry of one (1) hour for a telephone call to the court clerk referenced

32

in Defendant's Answering Brief does appear unusual on its face. Upon further review, the Plaintiff determined that the description for this time entry in the Itemization was inaccurate, as the entry was intended to cover multiple conversations between counsel and the clerk. The Plaintiff apologizes for this inaccuracy" (Thomas, Court File No. 96, p. 9 n. 5).

56. A one hour telephone conversation with a court clerk by Respondent, given that he was very busy and had great demands on his time from other matters and had staff members to handle matters such as that, should have stuck out in his mind.

57. Had the Respondent maintained a contemporaneous record of his time and had recorded a one hour telephone conversation with Angela Brush, he would not have conceded this was unlikely to have occurred.

58. Had the Respondent maintained a contemporaneous record of this time and had recorded multiple conversations with Angela Brush over several days, he would not have claimed a one hour conversation on a specific date.

59. The reason Respondent made the false claim is because he simply lifted Mr. K's description of Mr. K's work and claimed it as his own.

60. This explains why Respondent later communicated with Mr. K after the fee petition had been filed to see whether Mr. K had talked to Angela Brush for an hour.

61. During his testimony at the hearing, Respondent in essence conceded he had no contemporaneous record documenting he had talked to Angela Brush for an hour, either in one or many conversations. ("And so, on or about May 13,

33

from Chad Rickman's office, my associate attorney, Chad and I were debating about, you know, it didn't – I couldn't recall everything about it. So I said, you know what, let's just pull it. And so, Chad and I were of a mindset to concede on the entry and just say, you know, let's concede because it doesn't make good sense to us. . . . I mean it could have happened, and certainly it did, and it was in the record. And I remembered a lot, a whole lot about the case, but I didn't specifically remember it and was uncomfortable including it.") Tr. Vol I, pp. 122-23.

62. Mr. K submitted his invoices to Respondent every two weeks and determined himself the narrative description he would place on the invoices. ("I – I made all of my descriptions. I created all my descriptions myself based on the work that I did.") Tr. Vol. IV, p. 115. Because Mr. K was describing the work he had already performed it made no sense for him to use any description but an accurate description of what he had done.

63. Respondent was aware of Mr. K's invoices and the narrative descriptions therein. The Court finds Respondent's contention he never reviewed Mr. K's 2009 invoices for work done on the Thomas case until Respondent was preparing the fee petition in 2011 to be not credible. Tr. Vol. III, pp. 246-50.

64. On no occasion did Mr. K copy Respondent's supposed contemporaneous time records entries to include as the narrative description on his invoices. Tr. Vol. IV, p. 28.

65. There would be no reason for Mr. K to copy Respondent's supposed contemporaneous time records when he would be submitting those to

34

Respondent.

66.     On occasion Respondent made notes, comments or edits which required Mr.
K to do work.  After accomplishing the work Mr. K would describe in his
own words the work he had performed at Respondent's directions.  However,
these notes, comments, or edits were never the substance of any of the
narrative descriptions in Mr. K's invoices.  Tr. Vol. IV, pp. 31-32.  As Mr.
K testified at the hearing, he would use the comments or notes to create the
narrative entries in his invoices but the verbiage in the comments would not
be used.  (A.  "So, for example, if – if I can make something up, just a
random hypothetical, if I – if  I said, you know, we're working on this case
and Loring provided and reviewed edits, and I would say,  you know, I edited
– entered Loring's edits regarding this, this, and this, and those were the edits
that he had provided in the handwritten comments."  Q.  "Did you ever take
the exact language that he used in his comments and copy it verbatim and use
it in your time records?"  A.  "I certainly don't think so.")  Tr. Vol. IV, p. 32.
Mr. K is saying that if Respondent told him to edit a document in a manner
desired by Respondent, then in the narrative description on his invoice he
would write: "edited documents as instructed by Loring."  This language
would not be a copy of Respondent's verbiage.

67.     Respondent testified that in all the time he made entries into the supposed
contemporaneous time records, he never noted any wording alterations or
changes that had been made to his prior entries.  Tr. Vol. III, pp. 243-46.

68.     Respondent also testified that he never once detected an invoice where Mr.

35

K had used the identical or similar language in his invoice that Respondent had used in his supposed contemporaneous time record. Tr. Vol. III, pp. 248-50.

69. Respondent, in an effort to assure Mr. K he would not have to testify in any hearing regarding the fee petition, in an April 11, 2011 e-mail to Mr. K stated "I billed a lot of the time for my reading your work rather than you doing it so you won't have to testify if it comes to that." (Hearing Ex. 11).

70. The plain meaning of this e-mail is that instead of submitting to the court a fee petition that made a claim for the work Mr. K had done, and for which Respondent would be reimbursed $90 per hour, Respondent decided he would place his own name on Mr. K's work, for which he would be reimbursed $300 per hour, on the premise he had read Mr. K's work. By this means Mr. K would not have to testify in any dispute over the petition.

71. Respondent's counter-interpretation of this e-mail is not credible. Respondent claims he was merely indicating to Mr. K that by omitting Mr. K's hours on the petition, "I'm not slighting your contributions; there's just an important [*Chamberlain*] rule" which Respondent was applying. Tr. Vol. I, p. 128. However, if Respondent meant to indicate application of the *Chamberlain* rule to work performed jointly by himself and Mr. K, he would have told Mr. K he was billing for "work we did together," or something to that effect, rather than for "reading" Mr. K's work. Conversely, if Respondent truly meant he was going to bill for reading Mr. K's work, then the fee petition is still false because it frequently describes Respondent

36

actively performing some task also listed in Mr. K's invoices, rather than reading or reviewing Mr. K's performance of that task.

72. Respondent claimed time for work that was in excess of the time he actually expended. Just to use one instance as an example,[6] Respondent's marked-up copy of the amended Thomas complaint (Exhibit 14-1) was offered to demonstrate that he had in fact worked on the amended complaint. The question, though, was whether he had actually spent 2.1 hours on the work as the fee petition claimed (Thomas, Court File No. 93-1, p. 2), not whether or not he had worked on it. The exhibit is a seven-page draft of an uncomplicated amended complaint that had been prepared by one of his associates, Juliane Morris. The document had been previously reviewed by Mr. K, who filed an invoice regarding his work on the document. In the fee petition Respondent claimed he spent 2.1 hours on "initial draft of amended complaint." However, when questioned about what exactly he had done for 2.1 hours, Respondent gave a rambling dissembling answer that did not at all explain how an experienced attorney with many other demands on his time could have spent over two hours on this. The amended complaint was

---

[6]By using this example the Court is in no way giving an opinion that Respondent did or did not perform the work claimed on other matters, especially those not involving Mr. K. This particular example is only being used because it came up during Respondent's testimony as the first entry on the chart prepared by Respondent to explain the circumstances of the fee entries with similar verbiage to Mr. K's invoices, and it was patently clear that he did not spend over two hours on the work as he claimed. When pressed with exactly what he had done he could only give general descriptions of reviewing and editing the work. The document, that is, the draft amended complaint containing Respondent's handwritten notations, had his edits on it and those edits were indicative of at most 30 minutes of work by a competent attorney.

drafted by an associate in his office using the original complaint as a basis. It is possible but unlikely that even she spent two hours on the document. Additionally, she had Mr. K, a highly legally-trained person with experience as a federal appellate judicial law clerk, assist her with the drafting. In reviewing Respondent's handwritten edits and notes, they are what one would expect to see from an experienced attorney reviewing the work of an associate. There is nothing in the edits or notes that reveals more than the simple review and instruction inherent in reviewing a junior's work. Looking at his edits and notes, a reasonable amount of time for this task would be fifteen minutes. Giving him the benefit of the doubt, and assuming he is very slow, he might have taken 30 minutes to do what is reflected on the document. In Respondent's testimony at the hearing, he never says he had a contemporaneous time record of his time on this entry. Tr. Vol. I, pp. 142-43; Tr. Vol. III, pp. 250-57.

73. The Court specifically finds Respondent did not spend 2.1 hours on the draft of the amended complaint, as claimed in the fee petition.

74. Respondent claimed reimbursement for mileage that he did not have and did not owe. Respondent submitted a claim for travel to Alabama when Mr. K actually drove and did not bill Respondent. Tr. Vol. IV, pp. 37-38. Respondent had not received a bill for Mr. K's mileage for this trip and Mr. K never sent Respondent a bill for the trip or provided Respondent the mileage for the trip. Respondent argues this was an "incurred" expense and he did not know he was not going to be billed. Respondent failed to inform

38

the court that he was submitting claims for expenses that he did not know he would have to pay. Respondent's submitting to the court a claim for which he had no entitlement is indicative of his cavalier approach to creating the fee petition, and demonstrates the unreliability of his submissions.

75. Although Respondent claimed an hour of his time in "[t]alk[ing] to [Deputy Clerk of Court] Angela Brush at district court to correct misunderstandings re our filings," (Thomas, Court File No. 93-1, p. 4), the Court finds this is false, and Respondent did not talk to Angela Brush for an hour. It would be highly unusual for any attorney to spend an entire hour on the telephone with a deputy clerk. This is only more so for Respondent with all of the other time demands he had on him at the time the call was made. Respondent had staff members who could easily and effectively do such things. The call, made by Mr. K, concerned how to properly file a document on the court's electronic case filing system. Respondent himself in essence admitted he had not, in fact, talked to Ms. Brush. When it was pointed out to him after he had filed the fee petition the implausibility of him having been on a telephone conversation with a deputy clerk for an hour, he admitted this was questionable and offered to drop this aspect of the claim. Respondent has no contemporaneous record to demonstrate he spoke to Ms. Brush for an hour. ("And so, on or about May 13, from Chad Rickman's office, my associate attorney, Chad and I were debating about, you know, it didn't – I couldn't recall everything about it. So I said, you know what, let's just pull it. And so, Chad and I were of a mindset to concede on the entry and just say, you

39

know, let's concede because it doesn't make good sense to us. . . . I mean it could have happened, and certainly it did, and it was in the record. And I remembered a lot, a whole lot about the case, but I didn't specifically remember it and was uncomfortable including it.") Tr. Vol. I, pp. 122-23.

76. Mr. K had actually talked to Angela Brush and his time records reflected the call and the time. The entry was correct but the attribution to Respondent was wrong.

77. Respondent failed to provide Ms. Creswell with any evidence that indicated he maintained a contemporaneous record of the time he spent on the claim in the fee petition.

78. Respondent failed to provide the Court with any evidence that indicated he maintained a contemporaneous record of the time he spent on the claim in the fee petition.

79. The Court finds Respondent did not have a contemporaneous time record from which to create the fee petition.

80. Having no contemporaneous time record, the Court finds Respondent lacked an exact memory of specifically how much time he had spent on various tasks in the Thomas case, some of which occurred almost two years before the filing of the fee petition.

81. Respondent failed to provide any credible explanation for the identical and nearly identical language between Mr. K's invoices and Respondent's fee petition.

82. The only credible explanation for the identical language is that Respondent

40

knowingly and intentionally copied from Mr. K's invoices to prepare the fee petition, because Respondent did not have his own contemporaneous time record. The Court finds Respondent did, in fact, knowingly and intentionally copy from Mr. K's invoices in preparing the fee petition.

83. It is so obvious Respondent copied Mr. K's invoice entries that the Court can only conclude Respondent's untruthful denial on this point is because Respondent knew he had not actually performed all of the work claimed.

84. Respondent was not truthful to the Court during his testimony in the hearing. The Court had intimated this to Respondent during his testimony at the hearing. Tr. Vol. III, pp. 161-63.

85. Mr. K suffers from [common psychological conditions]. Tr. Vol. IV, p. 67. However, there is nothing in or about [his conditions] that causes a person to be untruthful. Tr. Vol. III, pp. 31-32. Mr. K has never had a narcissistic personality disorder or psychopathic disorder or antisocial disorder as those disorders are defined in the DSM IV. Tr. Vol. III, pp. 32-55, 137-53.

86. Respondent agrees it was proper for Mr. Brown to report to this Court his concerns that Respondent had submitted a false fee petition and had claimed Mr. K's work as his own on the fee petition. Tr. Vol. III, pp. 153-56.

87. Respondent admitted in his testimony at the hearing that it made no sense for Mr. K to enter Mr. K's time into Respondent's supposed contemporaneous time record or to enter Respondent's own time into the supposed contemporaneous time record, and he has no knowledge of Mr. K ever doing either. Tr. Vol. III, pp. 230-37.

41

88. Respondent admitted in his testimony at the hearing that he never detected that Mr. K's narrative descriptions of the time contained in his invoices were identical or remarkably similar to the descriptions contained in the supposed contemporaneous time record maintained by Respondent, although Respondent was evasive and slippery regarding the simple question. Tr. Vol. III, pp. 247-50.

89. Respondent failed to demonstrate the degree of competence required of attorneys admitted to the bar of the Eastern District of Tennessee by, first, not maintaining a contemporaneous time record when the possibility of a discovery sanction arose; second, adopting as his own the time entries of Mr. K; and third, by submitting the fee petition to the court without disclosing he did not have contemporaneous time records to support the claims in the fee petition.

B. Based upon the above findings of fact, the Court further finds by clear and convincing evidence, specifically the testimony of Respondent, the fee petition submitted in the Thomas litigation, and the invoices submitted to him by Mr. K that Respondent:

1. In submitting the fee petition to the court, falsely certified to the court that the petition had evidentiary support and was not submitted for an improper purpose;

2. In submitting the fee petition to the court along with the other exhibits, engaged in conduct involving dishonesty, fraud, deceit, and misrepresentation;

42

3.     In submitting the fee petition to the court, engaged in conduct that is prejudicial to the administration of justice;

4.     In submitting the fee petition to the court, intentionally offered evidence to the court that Respondent knew to be false;

5.     By not maintaining contemporaneous time records to support the claims in the fee petition, by claiming in the fee petition time for which he did not have a contemporaneous time record, and by failing to disclose to the court the absence of a contemporaneous time record, failed to demonstrate the degree of competence required of attorneys admitted to the bar of the Eastern District of Tennessee.

6.     In submitting the fee petition to the court engaged in unethical conduct tending to bring the court and the bar into disrepute.


## VI.     ANALYSIS

### A.     AUTHORITY OF THE COURT

Implicit in the concept of a court is the possession of certain powers necessary to the court's functioning. "It has long been understood that 'certain implied powers must necessarily result to our Courts of justice from the nature of their institution,' powers 'which cannot be dispensed with in a Court, because they are necessary to the exercise of all others." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991) (quoting *United States v. Hudson*, 7 Cranch 32, 34 (1812)). Among these necessary powers is "the power to control admission to [the court's] bar and to discipline attorneys who appear before it." *Id.*; *see also Ex Parte Burr*, 22 U.S. 529, 531 (1824). Disciplining an attorney includes the authority to suspend and disbar that attorney:

43

> Courts have long recognized an inherent authority to suspend or disbar lawyers. *Ex parte Garland*, 71 U.S. 333, 378-79 (1867); *Ex parte Burr*, 22 U.S. 529 (1824). This inherent power derives from the lawyer's role as an officer of the court which granted admission. *Theard v. United States*, 354 U.S. 278, 281 (1957).

*In re Snyder*, 472 U.S. 634, 643 (1985); *see also Bradley v. Fisher*, 80 U.S. 335, 354 (1871) ("This power of removal from the bar is possessed by all courts which have authority to admit attorneys to practice.").

In the Eastern District of Tennessee, the Court "may impose discipline on any member of its bar who has violated the Rules of Processional Conduct as adopted by the Supreme Court of Tennessee, or has engaged in unethical conduct tending to bring the Court or the bar into disrepute." E.D. Tenn. L.R. 83.7(a). Formal disciplinary proceedings are initiated, either after submission of a complaint or on the Chief Judge's own initiative, by the Chief Judge through an order to show cause, to which the member of the bar has 21 days to respond. E.D. Tenn. L.R. 83.7(b), (e). The local rules provide for a hearing on disciplinary charges. E.D. Tenn. L.R. 83.7(i). Throughout the disciplinary proceedings, a member of the bar is entitled to procedural due process, which includes notice and an opportunity to be heard. *See Ex parte Bradley*, 74 U.S. 364, 375 (1868) ("[the court] possessed no power to punish him, upon an ex parte proceeding, without notice or opportunity of defence [sic] or explanation for misbehavior"); *Dailey v. Vought Aircraft Co.*, 141 F.3d 224, 229 (5th Cir. 1998) ("an attorney is entitled to procedural due process which includes notice and an opportunity to be heard in disbarment or suspension proceedings").

## B.     OFFICER OF THE COURT

Respondent is an officer of the court. As such he has obligations and responsibilities that require him to live up to the highest standards of ethics and professional conduct. *Sahyers v. Prugh, Holiday Karatinos, P.L.*, 560 F.3d 1241, 1245 n. 4 (11th Cir. 2009) ("Membership in the bar is a

44

privilege burdened with conditions. A lawyer is received into that ancient fellowship for something more than private gain. He becomes an officer of the court, and, like the court itself, an instrument or agency to advance the ends of justice."). Among the obligations and responsibilities incumbent upon an attorney as an officer of the court is that he be candid and honest with the court. *Demjanjuk v. Petrovsky*, 10 F.3d 338, 352 (6th Cir. 1993) ("As an officer of the court, every attorney has a duty to be completely honest in conducting litigation"); *see also Burns v. Windsor Ins. Co.*, 31 F.3d 1092, 1095 (11th Cir. 1994) ("Every lawyer is an officer of the court. And, in addition to his duty of diligently researching his client's case, he always has a duty of candor to the tribunal.").

## C.    CREDIBILITY DETERMINATIONS

As the sole arbiter in attorney discipline cases, the Court is called upon to make findings of fact and credibility determinations. In this case, the Court has used the traditional tools in assessing credibility, including the witnesses' demeanor, appearance, mannerisms, contradictions, bias, interest, and consistency with other evidence. The determination that Respondent has engaged in unethical conduct as alleged in the Show Cause Order is based primarily upon two sources. First, the fact Respondent copied Mr. K's time entries from Mr. K's invoices. This is patently obvious from the similarity of language between Mr. K's invoices and the fee petition, as well as the several third-person references to Respondent in the draft petition which were removed in the final petition, and the one which made it into the final petition. Second, Respondent's testimony at the hearing. Respondent was the first witness, and he engaged in what can only be described as an effort to posit to the Court possible explanations or speculation without staking any position of his own. The following exchange from the second day of the hearing is illustrative of Respondent's evasiveness:

> Q. All right. I think you testified that at some point your work for ■■■ had been as much as one-third of your time; is that right?
> A. It may have been, yeah. I believe – I mean, you know, I think I said that I'm

45

coming up with rough numbers. I think I gave some caveats around that because we've never precisely measured it. But possibly in some of the hot years, yes, ma'am.

Q. When Mr. Pera was questioning you, you gave your best estimation as between a quarter and a third of your time was for ▮▮▮▮ right?

A. I don't know if I called it my best, but I said my – maybe guess or best guess or the estimation, yeah.

Tr. Vol. II, pp. 31. This exchange is remarkable, considering most of what was being discussed was Respondent's own actions and thoughts. Yet even with such subject matter, Respondent was unwilling to speak frankly and non-equivocally, instead hedging with some baffling distinction between "best" estimations and regular estimations, guesses, and "best" guesses.

In another instance, Respondent was asked whether every time entry on the fee petition was derived from the original contemporaneous record Respondent supposedly kept. He gave this evasive answer:

Q. Okay. Everything that is on the fee petition, all of the time entries that are on the fee petition, they fall within the category of after the time you started to keep your own time records; do they not?

A. I believe so but perhaps – and I'm not sure. There may have been some of the earlier ones that we might have reconstructed, but I think you're right on that, ma'am.

Q. I need you to give me your best recollection on this question at this moment in time. Did you use your original time record that you described as being kept in a Word document for every entry that is on the fee petition or are there some of them that you reconstructed in some other way?

A. It may be that there are a few – that's right – that were reconstructed in some other way. That's correct. There may have been something. I don't remember any right now. But it's possible, I suppose. There may have been something I forgot, or there may have been a few on there before the time that we began billing time. But we tried to avoid that.

Tr. Vol. II, pp. 37-38. In this exchange, Respondent both affirms all the time entries on his fee petition occurred after the time he started to keep his own time records ("I think you're right on that, ma'am"), while hedging that "it's possible, I suppose" that some of time entries may have taken place before he began keeping a contemporaneous time record, and so would have been

46

reconstructed when preparing the fee petition. In this manner, Respondent avoids ever affirming with any conviction that he either did or did not reconstruct items on the fee petition – an important issue in this case, to which he reasonably should have been able to give a straight answer.[7]

Regarding the creation and maintenance of the document that purportedly contained his contemporaneous time record, Respondent gave this equivocal testimony:

> Q. You do have a recollection of the original creation by you of a time record on one of your computers; do you not?
> A. I opened up a document and started keeping time. Exactly, yes, ma'am.
> Q. And you personally did that?
> A. Well, I could have given a sheet of it written down and had someone else do it. It's certainly possible. I don't remember for sure.
> Q. So you don't remember whether you did it personally or whether you had a secretary do it?
> A. For the very first time, no, ma'am.
> Q. Well, what's the next time that you do have a recollection of? Do you ever have a recollection of personally putting your own time in that – in that time record?
> A. Yes. I mean, I know that I did it. I recall doing that. I don't recall on which specific occasions.
> Q. So you do recall at some point you had the document, and it was a Word – Microsoft Word document on your computer, and you personally worked on the document; true?
> A. I believe it was on my computer, and I know that I have entered time into a – that document.
> Q. And when I say entered time, I mean you used the keyboard to make changes to that document on your computer; is that true?
> A. I – I think so, ma'am. I do, yes.

Tr. Vol. II, pp. 49-50. In this exchange, Respondent at first admits to remembering "open[ing] up a document and start[ing] keeping time" – a description clearly contemplating personal action rather than action through an agent. However, when asked to make the implicit explicit – to affirm he personally did this – Respondent gives the caveat that perhaps (though he has no memory either way) someone else "could have" created the document and started keeping his time. This

---

[7]Respondent also fails to give any credible explanation for the nearly identical language between Mr. K's invoices and Respondent's fee petition.

maneuvering evidences a remarkable unwillingness to be "pinned down" to any particular version of the facts regarding the creation and maintenance of his contemporaneous time record, an unwillingness on display throughout his testimony. Even the one-time existence of the time record on Respondent's computer – a fact he had earlier testified to – and his use of a computer keyboard to input the changes could not be stated without qualification; Respondent "believed" the time record was on his computer, and he "thinks" he used the computer's keyboard to make the changes.

A few moments after the above exchange, Respondent contradicted something he had told Ms. Creswell during her investigation, but attempted to explain away the contradiction in characteristic non-committal fashion:

> Q. Okay. In 2011, was there a network that allowed you to have the same document on all different machines in your office?
> A. I think if two people were working on it at the same time, it may have locked up. But that question may be over my head. But I don't know if it was sophisticated enough that two people could be editing at the exact same time.
> Q. Mr. Justice, do you recall me asking you questions along these lines when I interviewed you for the purpose of this case?
> A. I do recall something along this nature but not exactly these.
> Q. Do you recall I asked you specifically if your computers were networked and you told me no?
> A. Well, yes, ma'am. I don't know at that time, and I don't recall that. But I didn't know as nearly as much about computers as I do today, so in no way did I ever intend to mislead you. And I still don't know exactly the definition in computer terms of the network, so I'm not trying to be difficult in any way. But we had some kind of sharing system in 2011.
> Q. Mr. Justice, is it true that when I interviewed you, you did not tell me anything about a sharing system on your computer network?
> A. I don't know if I was asked exactly that. I don't recall.
> Q. You recall we talked about how you were able to transfer documents and different people work on the same document within your office. You recall that; don't you, Mr. Justice?
> A. Yes, ma'am. We talked about that a little bit. Yes, ma'am.
> Q. Okay. Is it your testimony that you wouldn't have thought to tell me that you had a sharing system when we were talking about that subject?
> A. I don't know that we talked about it such that that was clear to me to be the answer. I mean, that was – as you know, we had a conversation and we talked about a number of things and background. And I promise I don't recall a question that

48

would have brought that to my mind or made that absolutely necessary to say that in any way, ma'am. And frankly, at that time, I didn't know what a lot of these terms meant. Obviously, I've learned them through this case.

Q. Did – do you recall that I asked you how different employees would get your time record that you said you had kept in order to turn it in to the fee petition and you told me they would either have had to share it on a flash drive or they would have had to e-mail it to each other. Do you recall that?

A. I don't recall that exactly in those words but similar to that. I think that's probably the way it was done, so something like that. I know, for example, Caroline used flash drives a great deal.

Tr. Vol. II, pp. 53-55.

While observing these and other similar exchanges during Respondent's testimony at the hearing, the Court concluded Respondent was intentionally dissembling because he wanted to avoid perjuring himself. Indeed, at one point during Respondent's testimony the Court had to admonish him due to his evasiveness in answering a question about how he transferred his time record from one computer to another with a rambling non-committal answer:

> THE COURT: Mr. Justice, I really hate to interrupt and please forgive me for doing so. But this is a really critical issue here, and it is not helpful to talk about, you know, what could have happened and [what is] possible – what we're asking about is what actually happened with you. What did you do, not what other people could have done, or what's theoretically possible, or what type of technology is out there, or what different computers could do. What we're asking about is what did you specifically do on this occasion. So if you could, focus on that.
>
> As I say, this is a really critical issue and this really gets to the nub of what the issue is. It is what you did, not what someone else did or what could have [been] done, or what might have happened, but what actually did happen to the best of your recollection. If you don't remember what happened, then the answer is I don't remember what I did.

Tr. Vol. II, pp. 48-49. Based upon its review of the record and consideration of Respondent's testimony at the hearing, the Court concludes Respondent's explanations for: 1) his contemporaneous record keeping; 2) the time he spent on various matters in the Thomas litigation; 3) how the fee petition was prepared; 4) how he came to list the various entries in the fee petition;

49

5) the use he made of Mr. K's time entries on Mr. K's invoices; 6) whether he spoke to Angela Brush for one hour; 7) whether he spent 2.1 hours drafting the amended complaint; 8) the meaning of the "reading your work" email; and 9) how the claim for mileage reimbursement got in the fee petition since he did not bear the expense, were all false. Furthermore, the Court concludes the reason for Respondent's false testimony was to conceal his submission of the fee petition claiming monetary benefit for which he did not have records to demonstrate his entitlement to the fees. In making this determination, the Court concludes by clear and convincing evidence Respondent has violated the Rules of Professional Conduct and engaged in conduct tending to bring the Court and the bar into disrepute.

The Court reaches this decision irrespective of the testimony of Mr. K. That is to say had Mr. K not been a witness in the case the Court would have reached the same conclusion based upon Respondent's testimony and demeanor on the stand, and the documentary evidence. However, the Court would observe that it found Mr. K to be a credible witness.[8] His manner on the stand, the directness of his answers, the logic and reasonableness of these answers, and his response to cross-

---

[8]The Court notes Respondent spent considerable time and energy attacking Mr. K's credibility and motivation. Respondent suggested during his testimony that Mr. K is a psychotic and, although not put in exactly these terms, a pathological liar. This is regrettable at least in part because it was Mr. Brown who brought this matter to the Court's attention, (Q. "Did you file a lawyer disciplinary complaint against Mr. Justice?" A. "I gave my attorney permission to do what he saw fit, necessary with the information he had.") Tr. Vol. IV, p. 72, and not Mr. K. It is also regrettable because even during his testimony at the hearing, Mr. K had obvious affection for his close friend Mr. Justice, (Q. "And would you consider yourself to be friends with Mr. Justice?" A. "Well, yes. But it's difficult to sit here at the moment and not feel – this is both a difficult and a very sad day.") Tr. Vol. IV, p. 17, only answered the questions put to him, derived no pleasure in having to testify about the actions of his longtime close friend, and did not go out of his way to damage Respondent. Respondent, on the other hand, presented a tremendous amount of material intended to destroy Mr. K's character. In one filing Respondent's forensic computer examiner even attacked Mr. Brown. This is sad because Respondent himself admitted it is noble and honorable for an attorney to bring to the attention of the authorities perceived violations of the ethical standards.

50

examination lead the Court to conclude his testimony was reasonable and credible. Mr. K was taking medications for his [conditions], including [list of medications]. Some or all of these medications cause a flat affect which was exhibited by Mr. K in his testimony. In the Court's experience, this affect is common with individuals taking medication for [these conditions]. As the Court said earlier, however, Mr. K's testimony is immaterial to the Court's finding Respondent engaged in unethical conduct. But to the extent Mr. K's testimony is consistent with the Court's findings of fact, the Court will credit his testimony; to the extent his testimony is inconsistent with the Court's findings of fact, the Court will not credit his testimony.[9]

This conclusion regarding Mr. K's testimony permits the Court to comment on some of the other affidavits or declarations that were submitted. First, Dr. Workman: Dr. Workman did not examine Mr. K personally and has never met Mr. K. The Court will not comment on the propriety of a physician, including a psychiatrist, making a diagnosis without ever seeing a person, but does note that it places less reliance on such an opinion than one given by an examining physician.

---

[9]Respondent has challenged recordings of telephone conversations between him and Mr. K which were entered into evidence during the hearing and played. Respondent argues the recordings are not authentic. The recordings played little to no part in the Court's decision, so the Court need not resolve this. The Court would observe that after hearing the recordings in court, and taking them home overnight and listening to them, Respondent did not definitively state the conversations did not occur, that he was not a party to the conversations, or that they did not accurately recount what took place during the conversations. In fact, Respondent submitted telephone records that confirm he did have a number of telephone conversations with Mr. K on the date the recordings were purportedly made. Respondent suggests metadata which should be attached to the recordings is missing. Respondent is aware from the testimony at the hearing, however, that Mr. K testified he recorded the conversation on a computer. The compact disc (CD) that was used in court did not come from Mr. K, but from Mr. Brown who used some technology to create the CD used in court. What that technology was or what it would do the metadata was not explored or explained at the hearing. Tr. Vol. III, pp. 293-94. Also, Respondent argues the conversations cannot be authentic because there is a reference by him to rain in the conversation. There is disputed evidence as to whether there was rain or not. Moreover, this argument assumes Respondent, if he did engage in the conversation, was truthful in his statement about rain. If one cannot assume he was truthful then this conclusion drops away.

Additionally, Dr. Workman has a clear bias. He has had a long-time relationship with Respondent, testifying as an expert for Respondent multiple times. Tr. Vol. III, pp. 258-59. Dr. Workman based his opinion upon materials and information provided by Respondent, who is not a neutral source. Moreover, some of Dr. Workman's opinions are flatly contrary to the DSM IV, as Respondent himself admitted. Mr. K has a diagnosis of [condition] which he has had for many years. He has been able to participate fully in society with this illness and there is no evidence that it has resulted in the severe problems about which Dr. Workman speculates. For example, based upon the August 17, 2009 entry by Respondent in his fee petition, Respondent spent 5.7 hours "[p]resent[ing] his planned discovery motion hearing arguments to Ben K and was mooted by him, discussed positives and negatives of [his] arguments and case analysis before tomorrow's discovery hearing in light of moot session with K." One would think that if Mr. K was experiencing the severe problems Dr. Workman noted in his opinion, Respondent would not be depending and relying upon him in such an important matter for 5.7 hours. One would also think Respondent would have detected these problems during the several years of their close and supportive friendship. The Court might have been able to give more weight to Dr. Workman's testimony had the Court had the benefit of his live testimony at the hearing.

The Court also comments on the expert opinion of Yalkin Demirkaya. Mr. Demirkaya is presented as a forensics expert and expert in "fraud investigation." Mr. Demirkaya actually submitted one opinion at the hearing, and a later one after the hearing. The Court notes Mr. Demirkaya's second opinion is not helpful to the Court. In his earlier opinion, instead of confining himself to providing an expert opinion that might have been helpful to the court as the factfinder, Mr. Demirkaya attempted, wrongly, to anticipate what the issues were in the case. In his second opinion, instead of confining himself to his field of expertise, he ventures into the role of factfinder,

52

making findings about Mr. K's psychological and character issues, opining that paper printouts of e-mail should not be regarded as authentic, finding it "odd" that the attorney of an individual suing Respondent moved into an office one floor below Respondent, and so forth. Moreover, much of Mr. Demirkaya's opinion concerns whether Respondent had fraudulent intent, whether Mr. K is truthful, and whether Mr. Brown is honest – matters outside of the expertise and purview of a forensic expert and expert in fraud investigation – as well as other completely irrelevant matters. For example, he offers an opinion that Respondent was "operating in good faith in itemizing the billing and tendering it to the Court." This obviously is a determination solely within the province of the Court, and Mr. Demirkaya's opinion is not helpful. Conversely, Mr. Demirkaya does not offer testimony on matters that truly are relevant and could have been helpful to Respondent's case. For example, Mr. Demirkaya does not testify he examined the several hard drives of Respondent's computer and located the contemporaneous time records, or found evidence of their past existence.

Mr. Demirkaya also has so many assumptions and fits of speculation in his opinion that many of his conclusions cannot be taken seriously. He assumes Respondent deleted a version of the supposed contemporaneous time record. Respondent never testified he did this and it is improper for Mr. Demirkaya to assume things not in evidence. He assumes certain computers were destroyed or disposed of but does not base his assumptions on anything in the record. He asserts Mr. K had access to Respondent's billing records, but this assertion is not supported by the evidence presented at the hearing. His opinion ignores that had there been a contemporaneous time record as testified to by Respondent, that record would have been on as many as four computers of Respondent along with a flash drive. He confuses metadata with data retained on a computer's hard drive even if the document is deleted. Metadata was never an issue in the hearing and the witness' confusion about this being an issue further undermines the weight to be given his opinion. Had Respondent provided

53

access to his computers and the supposed contemporaneous time record been located, metadata might have been instructive. But Respondent did not provide such access. And had access been provided and the fee petition itself located, metadata might have been of some help, although not as instructive. But as it is, metadata is simply a non-issue in this case, and Mr. Demirkaya's remarks on the subject are not helpful.

On at least one issue, Mr. Demirkaya's opinion appears at sharp odds with the testimony of Respondent. According to Respondent, his computers automatically defragmented every week. According to Mr. Demirkaya, disk defragmentation overwrites deleted data so that this data cannot be recovered. However, at the hearing which took place in February 2012, Respondent produced four versions of the fee petition, Exhibits 3, 4, 5, and 6, all of which were generated in April 2011, almost a complete year previously. According to Respondent, these versions came from his computers.[10] One of the versions, Exhibit 6, was not recovered by the expert until a few days before the hearing, and had never been previously disclosed. However, during the investigation by Ms. Creswell when all versions of the fee petition were requested, Respondent told her no more versions existed or could be located, even after diligent search with the assistance of a computer expert. Yet if Respondent was telling the truth about the computers being defragmented and Exhibit 6 actually came from Respondent's computers, then obviously Mr. Demirkaya's opinion about the unrecoverability of deleted data on defragmented drives is erroneous. But if Mr. Demirkaya is correct, then Respondent would have been untruthful about the computers automatically defragmenting. The only other possibilities are: a) Exhibit 6 was never deleted, in which case

_____

[10]One of the versions, Exhibit 3, had been found by Respondent and disclosed to Ms. Creswell at the outset of her investigation. Two of the versions, Exhibits 4 and 5, had not been found by Respondent in his initial efforts following the subpoena, but were later recovered off his hard drive by an expert and subsequently disclosed to Ms. Creswell.

Respondent was untruthful when he earlier told Ms. Creswell no more versions could be recovered, even after a search by an expert; or b) Respondent and Mr. Demirkaya are both telling the truth about the frequency and nature of defragmentation, but Exhibit 6 is fraudulent and did not actually come from Respondent's computers. In any event, Mr. Demirkaya's opinion regarding defragmentation and data recoverability is wrong at worst, unhelpful at best. As with Dr. Workman, the Court might have been able to give more weight to Mr. Demirkaya's testimony had the Court had the benefit of his live testimony at the hearing.

Finally, the Court also notes that Chad Rickman, Cindy Myers, Kristin Blankenship, and Caroline Vaughn – each of whom submitted declarations or affidavits on Respondent's behalf – are all present or former employees of Respondent, and thus have an obvious interest. Moreover, while several of these individuals testify broadly that Respondent kept time records in a Word document, none give specific information about that file, explain where that document went, or why no remnant of it can be found on any of the multiple computers and flash drives upon which it allegedly resided at some point in time. Much of the information contained in these documents is simply irrelevant to the issues in the case.[11] Additionally, none of these individuals testified at the hearing. Consequently, while the Court does not specifically find their affidavits and declarations are untruthful, it is unable to afford them the weight it would have had they testified.

### D. CLEAR AND CONVINCING EVIDENCE

Pursuant to E.D. Tenn. L.R. 83.7(i)(4), a respondent's violation of the Rules of Professional

---

[11]For example, a declaration by Ms. Blankenship spends several pages explaining that Respondent would often work jointly on projects with Mr. K, or would edit, mark-up, and/or amplify documents written by others. However, the issue in this case is not whether Respondent ever worked on projects jointly with Mr. K or whether some of the entries in the fee petition accurately reflect work Respondent did – the Court has no doubt he did and they do; rather, the issue is whether Respondent did *all* the work reflected in the fee petition.

55

Conduct or engagement in unethical conduct tending to bring the Court or the bar into disrepute "shall be proven by clear and convincing evidence." The clear and convincing standard "is an intermediate standard which lies somewhere between 'beyond a reasonable doubt' and a 'preponderance of the evidence.'" *Sealmaster, L.L.C. v. Silver Line Bldg. Prods.*, 199 F. Supp. 2d 783, 796 (E.D. Tenn. 2001) (quotation omitted). The standard "requires there be no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *In re Taylor & Associates, L.P.*, 249 B.R. 474, 481 (E.D. Tenn. 1998). For the many reasons explained at length in this opinion – including the refusal of Respondent to admit what is obvious, namely, that he copied Mr. K's invoice entries, the non-existence of contemporaneous time records, the numerous similarities between the fee petition and Mr. K's invoices, the facial implausibility of an experienced attorney such as Respondent performing all of these similarly-worded time entries jointly with his paralegal, and Respondent's own testimony – the Court finds by clear and convincing evidence Respondent knowingly submitted a false and inflated fee petition, thereby violating the Tennessee Rules of Professional Conduct and engaging in unethical conduct tending to bring the Court or bar into disrepute. Additionally, the Court finds by clear and convincing evidence that Respondent, in failing to maintain a contemporaneous time record when it became apparent there might be a discovery sanction, in claiming in the fee petition time for which he did not have the support of a contemporaneous time record, and by not disclosing to the court he did not have a contemporaneous time record to support the claims in the fee petition, failed to demonstrate the degree of competence required of attorneys admitted to the bar of the Eastern District of Tennessee.

### E.     APPROPRIATE DISCIPLINE

#### 1.     NATURE OF DISCIPLINE

Having found Respondent's conduct was unprofessional and unethical, and violated the

Tennessee Rules of Professional Conduct, the Court must determine what disciplinary action is warranted. "[Attorney discipline] proceedings are not for the purpose of punishment, but rather seek to determine the fitness of an official of the court to continue in that capacity and to protect the courts and the public from the official ministration of persons unfit to practice." *Cunningham v. Ayers*, 921 F.2d 585, 586 (5th Cir. 1991) (citation omitted). "The Court must thus consider both the fitness of one of its officers and the need to protect the public from an unqualified or unscrupulous practitioner." *Matter of Searer*, 950 F. Supp. 811, 813 (W.D. Mich. 1996). As there is no uniform federal procedure for disciplinary proceedings, individual district courts are free to define the grounds for discipline, and the specific sanctions available. In this district, pursuant to Local Rule 83.7(a), "[d]iscipline which may be imposed includes disbarment, suspension, reprimand, or such other further disciplinary action as the Court may deem appropriate and just."

## 2. MITIGATING AND AGGRAVATING FACTORS

In determining the appropriate degree of discipline for Respondent, the Court first considers mitigating and aggravating factors in this matter.

### a. MITIGATING FACTORS

Respondent has never been accused of unprofessional conduct in this Court in the past, and with the exception of the complaint also made to the state bar on the same facts giving rise to this case, the Court is unaware of any accusations of unprofessional conduct that have been lodged against Respondent in other jurisdictions. Similarly, Respondent's misconduct here was opportunistic and is not the result of a pattern of misconduct.

### b. AGGRAVATING FACTORS

Respondent has demonstrated no acceptance or remorse for his misconduct. This posture extends not just towards the ultimate question of whether the fee petition was false, but even towards

the unassailable truth he copied from Mr. K's invoices. Respondent has never conceded the point, which would be obvious to any reasonable person. Indeed, not only has he not conceded the point, he has insinuated fantastic and non-evidentiarily supported possibilities, such as that Mr. K may have actually copied his invoice notations from Respondent's (now non-existent) time records, or even that Mr. K may have hacked into Respondent's computer and altered Respondent's fee petition or time records. Respondent's lack of acceptance and remorse and willingness to advance unsupported alternative theories rather than admit obvious truths is troubling to the Court.

Additionally, the Court notes Respondent was motivated by personal profit. Respondent's misconduct did not arise merely from negligence, the desire to take a time-saving "short cut," or inordinate zealotry on behalf of a client. Rather, Respondent stood to gain financially by claiming his paralegal's work as his own.[12] This is a baser motive than negligence, expediency, or client zealotry, and also one which corresponds to a higher need for public deterrence.

### 3. COMPARISONS

In determining the appropriate degree of discipline, the Court also compares Respondent's conduct to that of other attorneys who have been subjected to discipline by the Court.[13] In *In re Moncier*, 550 F. Supp. 2d 768 (E.D. Tenn. 2008), the Court suspended respondent Herbert Moncier

---

[12]It is immaterial whether Respondent *actually* performed an amount of work equal to or greater than the amount of time he included in the petition. Because Respondent did not have a contemporaneous time record to back up this work, he would be unable to *support* his claim for fees. Thus, by adopting Mr. K's time entries as his own, Respondent did stand to gain financially, measured from the baseline of what financial benefit Respondent's own time records would have supported.

[13]The Court has had the unfortunate experience of initiating disciplinary proceedings against just under ten members of the bar of the Eastern District of Tennessee. In one case the Court determined the allegations were unfounded after the hearing and took no action. In the other cases, the Court imposed a public reprimand, a private reprimand, and disbarment.

for a period of seven years, due to his failure to obey a direct court order and other misconduct. Mr. Moncier had been involved in previous misconduct. Similarly, in *In re Anderson*, 1:09-mc-1, the Court suspended respondent John Anderson for a period of five years, due to his failure to obey a direct order of the Court. Disregarding an order of the Court is an extremely serious ethical violation, for which neither Mr. Moncier nor Mr. Anderson expressed remorse. In *In re Cowan*, 1:08-mc-3, the Court suspended respondent Thomas Cowan for six months, because he represented to the Court he charged his bankruptcy clients $750 when he actually charged $1,000, and he failed to file clients' cases in a timely manner. The Court found Cowan's actions, though unprofessional and unethical, were the result of negligence rather than intentional misconduct.[14] In *In re Bell*, 1:10-mc-2, the Court publicly reprimanded respondent James Bell and ordered that he speak at law schools and professional organizations on matters of ethics. Mr. Bell had been convicted of criminal contempt for his unprofessional behavior, and punished criminally for that action. Moreover, Mr. Bell had admitted his misconduct and was remorseful for it. Here, Respondent's conduct of submitting a fee petition containing false attributions of work, while serious, is not as grave an offense as disobedience of a direct order of the Court. However, neither is it as slight an offense as Cowan's. Unlike Cowan, Respondent's unprofessional and unethical conduct was not simply the result of negligence – though Respondent surely was negligent in failing to maintain contemporaneous time records – but of the intentional, volitional choice to copy Mr. K's invoice descriptions into his own fee petition, despite not having personally performed all of the work claimed, and to falsely certify to the Court that the fee petition had evidentiary support when it did not. Respondent's conduct also involved a significant element of personal financial gain, a motive

_____

[14]Essentially, after raising his base attorney's fee from $750 to $1,000, he forgot to change the default setting for the fee disclosure form in his office's software system

which corresponds to a high need for public deterrence. And unlike Bell, Respondent has not exhibited remorse. The Court thus concludes appropriate discipline for Respondent falls between the lengthy suspensions given Moncier and Anderson, and the lighter punishments given Cowen and Bell. This degree of discipline will be achieved through a combination of suspension and monetary sanctions.

### 4.    SUSPENSION

Upon considering all the facts in this case, as well as comparing Respondent to past attorneys the Court has disciplined, the Court finds suspension is necessary to impress upon Respondent his high duty of being truthful in all representations he makes to the Court, and to deter Respondent and other attorneys from engaging in similar conduct.[15] Accordingly, the Court will suspend Respondent from the bar of the Eastern District of Tennessee for a period of six months, effective June 15, 2012, with the one minor exception noted in the following section.

### 5.    FORFEITURE OF PART OF FEE PETITION

As the Court said earlier, in finding Respondent did not perform all of the work claimed in the fee petition and that he falsely certified the fee petition had evidentiary support when it did not, the Court does not necessarily find Respondent did not perform some of the work, even most of the work, claimed in the fee petition. The Court assumes Judge Phillips, should he allow the Thomas matter to proceed, will award Respondent some amount for the work he spent locating Ms. Sonner. The award of fees was a sanction for discovery abuse committed by Lowe's, and just as "two wrongs don't make a right," so Judge Phillips may not deem it appropriate for Lowe's to escape responsibility for its discovery abuse simply because of Respondent's bad action. By the same

---

[15]The Court explained what suspension entails in this district in *In re Moncier*, 569 F. Supp.2d 725 (E.D. Tenn. 2008).

token, Respondent and other attorneys must understand there are repercussions to filing false fee petitions. Accordingly, the Court will order Respondent to forfeit to the United States 25% of any award he might receive from the pending fee petition, to be capped at a maximum forfeiture of $25,000. Such payment constitutes a fine, penalty, and forfeiture. Because of the need for finality in the matter of the fee petition in the Thomas case, and that matter's intertwining with the issues involved in this disciplinary proceeding, notwithstanding Respondent's six-month suspension, the Court will allow Respondent to litigate the fee petition before Judge Phillips during the period of suspension, should Judge Phillips so allow. Respondent will not be allowed to litigate any other issues in the Thomas case during this period, however.[16]

### 6.      REPAYMENT OF COSTS INCURRED BY THE COURT

Under E.D. Tenn. L.R. 83.7(k), "[a]ny attorney who is disciplined pursuant to this Rule may be directed by the Court to pay all or part of the fees and expenses incurred by the Court and/or by any counsel appointed by the Court to investigate allegations of misconduct and/or to prosecute or defend the disciplinary proceedings." The Court has expended significant funds in investigating and handling this case. Specifically, Ms. Creswell's fees for investigating and participating in the disciplinary proceeding totaled $32,858.97, and Mr. K's witness-related expenses totaled $2,079.73, for a final total of $34,938.70. In accordance with the Local Rules, the Court will order Respondent to pay these costs, as well as any future costs incurred by the Court in this matter, including in any appeal, assuming Respondent is unsuccessful in such an appeal. Any costs of Ms. Creswell incurred subsequent to June 1, 2012 shall be paid by Respondent directly to Ms. Creswell.

---

[16]Permitting Respondent to litigate the fee petition while under suspension also reflects the fact that he is pursuing his own interest, and would largely be acting *pro se* instead of representing the interest of a client. An attorney under suspension is allowed to represent himself in a *pro se* matter.

61

## VII. CONFIDENTIALITY

In his post-hearing brief, Respondent requests the entire case, including this opinion, remain sealed and confidential during the pendency of any appeal. Respondent cites his own reputational interest, as well as his client's interest in the Thomas case – an interest Respondent claims could be damaged through the very existence of this disciplinary case, as well as through divulgement of any confidential information related to the Thomas case that came out during this disciplinary case. The Court denies this request. Any interest Respondent has in keeping this case sealed is substantially outweighed by the public interest in knowing of, and hopefully being deterred by, attorney misconduct. However, the Court does recognize that other parties, namely Respondent's client in the Thomas case and Mr. K, may have legitimate interests in keeping portions of the record in this case confidential, including portions of this opinion. Accordingly, the Court will publish this opinion under seal, and will keep it and the entire case sealed until June 22, 2012. By Friday, June 15, 2012, Respondent should inform the Court – with great specificity including docket, page, exhibit, and line numbers – of any information in the docket or this opinion which should be redacted because it constitutes confidential, privileged, or work-product information related to the Thomas case. Once the Court makes any approved redactions, Mr. K, through his attorney Mr. Brown, will be given access to the docket (save any portions redacted or sealed per Respondent's request). Mr. K will have until June 21, 2012 to notify the Court – again with great specificity including docket, page, exhibit, and line numbers – of any information which should be redacted because of Mr. K's privacy concerns. At the end of this period, the Court will unseal the case and this opinion, save any information it redacts pursuant to Respondent's and Mr. K's requests.

## VIII. CONCLUSION

For the above stated reasons, the Court **ORDERS** that Respondent, Loring E. Justice, is **SUSPENDED** from the bar of the Eastern District of Tennessee for a period of six months commencing on June 15, 2012. While under suspension he is permitted to litigate his pending fee petition before United States District Judge Thomas Phillips, should Judge Phillips permit him to do so. Respondent shall **FORFEIT** to the United States 25% of any award he might receive from the pending fee petition, up to a maximum forfeiture of $25,000. Respondent shall **PAY** to the United States all costs the Court incurred in the investigation of this matter and conducting of the hearing. Any costs incurred subsequent to June 1, 2012 due to the work of Ms. Creswell should be paid directly to her. Should there be an appeal in this case and Respondent does not prevail, he shall pay all costs incurred by Ms. Creswell in the appeal directly to her. Respondent's reinstatement to the bar of the Eastern District of Tennessee is **CONTINGENT** upon his paying for all costs incurred by the Court in this matter, and the 25% fine, forfeiture, and penalty. This case, including this opinion, shall **REMAIN SEALED** until June 22, 2012, at which time is shall **BE UNSEALED**, save any portions the Court directs remain sealed.

        **SO ORDERED.**

        **ENTER:**


**/s/**_____
**CURTIS L. COLLIER**
**CHIEF UNITED STATES DISTRICT JUDGE**

# Appendix

Chart Comparing Mr. K's Invoice Verbiage with Respondent's
Fee Petition Verbiage, with Respondent's Comments

# Explanation by Loring Justice of Certain Time Entries
## in Fee Application in *Thomas v. Lowe's*

| Date | Time | Description of BKAG Work in Complaint Spreadsheet | Description of LJ, PLLC Work in Doc. 93-1 | Date | Time | Description of the Circumstances of the Entry |
|------|------|--------------------------------------------------|-------------------------------------------|------|------|-----------------------------------------------|
| 5/14/09 | 2.25 | Review of Juliane Morris initial draft Complaint. Extensive written comments and memo. | Initial draft of amended complaint. | | 2.1 | I believe Ben K███████ (BK) worked on the draft of the amended Complaint, but so did I. I was being assisted by Julianne Morris (JM). Because the work overlapped between me, BK, and JM, only my time was billed. The description of my time spent and BK's is *different* and our time expended is *different*. I believe JM had just arrived this day and it was the first project I gave her. She could not have produced this alone. It is clear that she got the facts from me. I worked with her to produce a draft. The draft was ok on facts but poor on law, so I gave it to BK to work on and I also worked on it further. Because there was much overlap only the initial 2.1 hours I spent working with JM to get an initial draft were billed and JM's time, BK's time, and my additional time were not billed so as to avoid billing for any duplication of effort. To demonstrate that I did this work, please see my edits to amended complaint attached as *Ex. 1*. See also emails from JM to LJ and from LJ to BK attached as *Ex. 2*. Please note that it is possible that my revisions could be to a later iteration of the amended complaint, but note that no other time was billed. |
| 6/8/09 | 1 | Motion to Compel. Complete Review and overhaul of Juliane's work. | Motion to Compel: Complete draft and then refinement. | | 1 | Under my supervision, JM attempted a draft that was flawed. BK and I were both anxious to remedy the work of JM. BK and I both worked with her and both took the document into each of our hands and each made revisions and refinement and then worked together on it as well. Because our work overlapped only mine was billed. |
| 6/12/09 | 3.5 | Motion to Have Requests for Admission Deemed Admitted. Reviewed Draft prepared by | Worked on Motions to Have Requests for Admission Deemed Admitted | 6/8/09 | 3.5 | Please note that my work occurred approximately **four days** prior to BK's. This motion was important and we all spent a great deal of time on it. My work was different than that of BK. |

20

| Date | Time | Description of BKAG Work in Complaint Spreadsheet | Description of LJ, PLLC Work in Doc. 93-1 | Date | Time | Description of the Circumstances of the Entry |
|------|------|---------------------------------------------------|-------------------------------------------|------|------|-----------------------------------------------|
| | | Juliane Morris. Researched case law related to necessary "reasonable inquiry" under rule 36(a)(4). | | | | Because there was some overlap, however, my work was placed in the itemization, but BK's was omitted. |
| | | | Researched case law related to necessary "reasonable inquiry" under Rule 36(a)(4) | | 4.6 | The duty of reasonable inquiry under Rule 36(a)(4) was a critical issue. It was discussed in great detail with BK and we both researched it in depth. Indeed, there was good reason to research it extensively as it was the duty of reasonable inquiry upon which the Court predicated the key discovery rulings against the Defendant. Quite simply, we were working generally on the same subject matter though at different times. I would note that my time of 4.6 hours appears nowhere in BK invoices. Doc. 15, *Motion to Deem RFAs Admitted (69 pages with exhibits)*. |
| 6/13/09 | 1.25 | Revision of Motion to Have Requests for Admission Deemed Admitted. | Revision of Motion to Have Requests for Admission Deemed Admitted. | | 1.2 | There is no doubt BK and I were working on this project together. Indeed, when he refers to revising the motion in part, he is referring to merging each of our comments and revisions into the document. Therefore, we were working on the same thing and our time overlapped and, as such, the entry is in no way false or misleading. I also billed less time than BK. *Ex. 3* |
| 6/14/09 | 2.25 | Added Loring edits to Motion to Deem Requests for Admissions admitted. Added Section about Letter to Clint Woodfin and Motion to Supplement. Researched electronic filing rules for the E.D. Tenn. | Edits to Motion to Deem Requests for Admission Admitted. Added section about letter to Clint Woodfin and Motion to Supplement. Researched electronic filing rules for the E.D. Tenn. | | 2.2 | BK and I were working on the same thing. In BK's complaint, left in very faint, near-unreadable type, the beginning phrase of the BK entry for this date which was **"Added Loring"** edits. If BK was adding my edits to the document, that confirms that I was editing the document as claimed. Also, the language regarding the letter to Mr. Woodfin and the Motion to Supplement were per my desire and the research was collaborative. Thus, pursuant to *Chamberlain*, only my time was billed and again my time entry was less than that of BK. *Ex. 3*. |
| 6/14/09 | .75 | Incorporated comments by BK and LJ to Juliane Morris draft. | Reviewed and revised again Motion to Deem Requests | | .7 | Again, in the chart included with BK's complaint, the only portion of the entry in normal type was "reviewed and revised." |

Case 1:11-mc-00008-CEA Document 38 Filed 06/25/12 Page 66 of 74 PageID #: 236

| Date | Time | Description of BKAG Work in Complaint Spreadsheet | Description of LJ, PLLC Work in Doc. 93-1 | Date | Time | Description of the Circumstances of the Entry |
|------|------|--------------------------------------------------|-------------------------------------------|------|------|------------------------------------------------|
| | | Reviewed and revised and sent to LJ for final approval. | for Admissions Admitted | | | The remainder was in faint type. However, the full entry indicates, *inter alia*, "incorporated comments by BK **and LJ**" and **"sent to LJ for final approval."** By the entry of BK, it is acknowledged that I am writing comments on the motion and that it was sent to me for final approval. In such circumstances, my entry that I "reviewed and revised" the document is hardly surprising. Because the work overlapped between BK and myself, only my time was billed and in an amount less than that reflected in the BK entry. *See Ex. 3* which confirms I did this revision. |
| 6/16/09 | 2.5 | All final preparations of Amended Complaint and Motion to Deem Requests for Admissions Deemed Admitted. Preparations of all PDF exhibits. Compilation of files. Filing with the E.D. Tenn via ECF. Hard Copies of everything for file. | All final preparations of Amended Complaint and Motion to Deem Requests for Admissions Deemed Admitted. Preparations of all PDF exhibits. Compilation of files. Filing with the E.D. Tenn via ECF. Hard Copies for everything for file. | | 2.5 | This work was collaborative with BK and, for this reason, the work was billed only for me and not for BK. On motions of this importance, I would have checked everything myself. Again, please note that, in almost all circumstances, if I had a time entry greater than that of BK, I used the least amount of time documented by either BK or myself. BK and I had a meeting that is reflected on my calendar entry for this date. *Id.* A purpose of the meeting was to check these documents. *The ECF time stamps show these documents were filed during or very near to our meeting time.* Thus, only my time was billed. *See calendar entry and emails attached as collective Ex. 4.* |
| 6/16/09 | 3 | Edited Motion to Compel Discovery and Memorandum in Support thereof prepared by Juliane Moore. | Preparation and editing of Motion to Compel Discovery and Memorandum in Support partially prepared by legal assistant. | | 3 | It is evident here that BK and I are both working on the same document and, as such, only my time was billed. I would also respectfully point out that, far from attempting to commit fraud and claim someone else's work as my own, I openly disclosed in the text of the entry that I am working with my staff. Yet no staff time is billed as to avoid any duplicative billing. The BK entry refers to *"Juliane Moore,"* presumably my former associate Juliane Morris. |
| 6/17/09 | 1 | Talked to Angela Brush at district court to correct misunderstanding re our | Talked to Angela Brush at district court to correct misunderstandings re our | | 1 | Please see the attached affidavit of Chad Rickman, *Ex. 5.* |

22

| Date | Time | Description of BKAG Work in Complaint Spreadsheet | Description of LJ, PLLC Work in Doc. 93-1 | Date | Time | Description of the Circumstances of the Entry |
|------|------|---------------------------------------------------|-------------------------------------------|------|------|------------------------------------------------|
| | | filings. Second conversation with LJ about Consent Motion to Amend with Clint Woodfin. Drafted Consent Motion for review by Clint Woodfin. | filings. | | | |
| 6/18/09 | 4.5 | Motion to Compel Discovery | Continued Research, revision and refinement of Motion to Compel Discovery | | 4.5 | BK and I have significantly different descriptions, but it is clear that we were both working on the same document. This was a large motion that ultimately spanned 50 pages of Court record and cited numerous facts and legal authorities. Because my work overlapped with BK, only my time was billed and only the lesser amount of time spent by either of us was billed. *Ex 6.* |
| 6/19/09 | .5 | Letter to Bob Davies re additional materials needed from MSG. | Letter to Bob Davies regarding additional materials need from MSG about the project | | .5 | BK and I have similar entries here because our work overlapped. I am sure that BK contributed significantly to the letter that specified what we needed from this important subpoenaed third party. But I also worked significantly on the letter. Pursuant to our adherence to *Chamberlain*, only my time was billed. *Ex. 7.* |
| 6/22/09 | 3 | Conference call with Blakeley. Finished Motion to Compel Discovery | Conference call with Blakely Griffith, summer associate, who was trying to locate potential witnesses in Alabama. | | .5 | I am at a loss as to why there could even be remote suspicion about this entry. There is no doubt that I ordered and made the call with Ms. Griffith (BG) and BK was a party to the call. I did not bill for summer associate BG's time or for BK's time, only for my own. My billing time here is far less than BK with his time at 3 hours and mine at .5. The call lasted 30 minutes. *See Ex. 8,* which verifies everything I claim about this entry. |
| 6/22/09 | | | Finished Motion to Compel Discovery | | .3 | Again, I cannot understand any suspicion about this entry. The amount of time listed is far less than BK and I must have been finishing the motion right around this time because, in his invoices on 6/26/09, BK specifically documents entering my final revisions to the Motion. BK Invoice 2009709, 6/26/09 (attached to BK complaint). A version of the file from 6/24/09 is titled, "Motion to Compel discovery with LJ Changes 6 24 09," *Ex. 9.* Again, because BK and I collaborated on this work, my time was billed and his was omitted. |

23

| Date | Time | Description of BKAG Work in Complaint Spreadsheet | Description of LJ, PLLC Work in Doc. 93-1 | Date | Time | Description of the Circumstances of the Entry |
|------|------|------|------|------|------|------|
| 6/26/09 | .5 | Entered final LJ revisions to Motion to Compel. Compiled exhibits in PDF format. | Compiled exhibits to Motion to Compel in PDF format with assistance of legal assistant. | | .3 | On the chart submitted by BK with his complaint, the phrase in my entry "with assistance of legal assistant" was placed in typeface so faint as to be almost unreadable on our copy. My entry is not odd or of concern. I entered significantly less time than BK did and admit that BK and I were working together on this activity as we so often did. Because the work was overlapping, my time was billed, while BK's was not. Doc. 20 (50 pages with Ex).<br><br>*Please also note that on or about 6/28/09, both BK and I worked on consent orders to resolve motions. **Ex. 10.** In an exercise of billing judgment, I deleted both our work entirely.* |
| 7/16/09 | .25 | Reviewed Loring's notes from meeting with Clint Woodfin and calendared follow-up call to Cory re: Clint's call. | Reviewed notes from meeting with Clint Woodfin and calendared follow-up call to Corey Kitchen re: Clint's call. | | .2 | |
| 7/22/09 | 5 | Drafted and typed memo for trip to Alabama | Drafted and typed memo for trip to Florence, Alabama to meet with Plaintiff's MSG co-workers. This memo summarized the liability issues in the case and listed important questions to ask to | | 5 | |

24

| Date | Time | Description of BKAG Work in Complaint Spreadsheet | Description of LJ, PLLC Work in Doc. 93-1 | Date | Time | Description of the Circumstances of the Entry |
|------|------|--------------------------------------------------|------------------------------------------|------|------|-----------------------------------------------|
| | | | try to understand whether it was plausible Lowe's could lack notice and to prove Lowe's indeed had notice and to gain physical description of individuals of interest. | | | |
| 7/23/09 | 2.5 | Discussed memo with LJ and minor revisions. | Discussed memo with paralegal K█████ and minor revisions. | | 1.5 | In the chart accompanying BK's complaint, the word "**LJ**" is in faint type in the BK entry. This is an important word as it clearly reflects that BK and I were conferencing about the memo and discussing revisions. Thus, because this work was collaborative, in an effort to be fair to Lowe's and to follow the conservative approach of *Chamberlain*, I billed only for my time, which was one hour less than that of BK. I have a version of this document with my extensive notes and comments. *Ex. 12* |
| 7/25/09 | 8 | Interviewed Corey Kitchen, Bradley Yeates, Rod Jackson and Randy Lee McBride. Met with entire group and Loring. Trip to Lowe's with Thomas and McBride to explain bays | Interviewed Corey Kitchen, Bradley Yeates, and Randy Lee McBride. Trip to Lowe's with Thomas and McBride to explain bays etc. Legal Assistant K█████ | | 12 | |

25

| Date | Time | Description of BKAG Work in Complaint Spreadsheet | Description of LJ, PLLC Work in Doc. 93-1 | Date | Time | Description of the Circumstances of the Entry |
|------|------|------|------|------|------|------|
| | | etc. | assisted because there were so many witnesses to interview, statements drafted, documents to manage, etc. | | | |
| | | | Ben K███████ assisting on the above interviews in Alabama. | | 8 | |
| 7/27/10 | 4.5 | Reviewed all notes from our trip to Alabama and compiled Master to Do List for Loring and BG. Drafted Affidavits of Kitchen, Yeates, and McBride Online research re: Teresa Beavers (Lowe's Manager) | Reviewed all notes from our trip to Alabama to meet with the MSG witnesses and compiled Master To-Do List. Drafted affidavits of Kitchen, Yeates, and McBride. Online research re: Teresa Beavers (Lowe's Manager) | 7/27/09 | 4.5 | The chart accompanying BK's complaint erroneously lists this work as occurring in 2010. Further, this work was collaborative. As the BK entry indicates, there was a review of "all notes" meaning the exchange of notes from BK to me and vice versa. This was collaborative work. Obviously, the all-important drafting of the affidavits was likewise collaborative. As such, this entry is explained by the *Chamberlain* doctrine. On collaborative work, only the time of the highest biller is used and, in this case, except in extraordinary situations, we used the time entry of the person who billed the least time. In addition, disturbingly, BK misrepresents the Loring Justice, PLLC billing entry in both Docs. 87-2 and in 93-1. The BK chart quotes the entries as identical but in no document have the entries ever been identical (7/27/09 entry in either Doc 87-2 or 93-1). It is a false quotation. With respect to the list, it was a joint project |

26

| Date | Time | Description of BKAG Work in Complaint Spreadsheet | Description of LJ, PLLC Work in Doc. 93-1 | Date | Time | Description of the Circumstances of the Entry |
|------|------|--------------------------------------------------|-------------------------------------------|------|------|-----------------------------------------------|
| | | | | | | and BK specifically asked me to add to the list. |
| 7/29/10 | .25 | Revisions of Affidavits of Kitchen, Yeates, and McBride | Revisions of Affidavits of Kitchen, Yeates, and McBride | 7/29/09 | .2 | Again, the chart accompanying BK's complaint incorrectly lists this work as occurring in 2010. This entry is quite simply explained. I made revisions to these affidavits, BK and I discussed my revisions, and he entered them into the computer. I billed for my time and not his and my time was less. |
| 8/8/10 | 4 | Coordinated with Debi Dean to make sure that Randy, Bradley and Corey will sign Affidavits and get them back to us notarized. Prepared final versions with LJ edits. ████████ Researched FRCP and EDTN Rules re: timeliness of Notice of Filing with respect to Hearing Date. Drafted Notice of Filing. Drafted Memorandum to accompany Notice of Filing for filing with the Court this week. | Coordinated with Debi Dean of Alabama Head Injury Foundation to make sure that Randy, Bradley, and Corey will sign affidavits and get them back to us notarized. Reviewed legal assistant's research of FRCP and EDTN Rules re: timeliness of Notice of Filing with respect to Hearing Date. Drafted Notice of Filing. Drafted Memorandum to accompany Notice of Filing for filing with the Court this week. | 8/8/09 | 3 | The entry on the chart accompanying BK's complaint is disturbing. It quotes the LJ, PLLC entry as identical to the BK entry, but it is not. Contrary to the misquotation of the LJ PLLC entry, the actual entry specifically indicates that I was reading and "reviewing" research compiled by the "legal assistant." To the extent that the entries are similar, this is simply because BK and I were working together on this important task. Also, the billing times are different: I put only 3 hours on this project, whereas BK put 4. No BK time was billed for this collaborative work. The chart accompanying the complaint has the date of the entry wrong. The difference between my billing entry here and that of BK is material. In the portion BK's chart altogether omits, I specifically acknowledge I am working with a legal assistant on the documents. Further, note that in name of the Memorandum [*Ex. 13*] is "LJ Edits," and this should demonstrate I was actively working in concert with BK. |
| 8/10/10 | .5 | Coordination of all Affidavit signings, etc. with Debi Dean. | Coordination of all Affidavit signings, etc. with Debi Dean. | 8/10/09 | .5 | ████████████████████████████ |

27

| Date | Time | Description of BKAG Work in Complaint Spreadsheet | Description of LJ, PLLC Work in Doc. 93-1 | Date | Time | Description of the Circumstances of the Entry |
|------|------|------|------|------|------|------|
| | | | | | | |
| 8/19/10 | .5 | Reviewed Clint Woodfin's protective order. Emailed comments to Loring. | Reviewed Clint Woodfin's Protective Order | 8/19/09 | .5 | In the BK billing entry as reproduced on the chart accompanying the complaint, the important phrase "Emailed Comments to Loring," is quite faint. Of course, this phrase demonstrates that I was reviewing the Order and obtaining comments upon it. Clearly, for reading and reviewing such a document, .5 hours is in order and my .5 hours was listed in the submission to the Court. BK's was not, pursuant the practice I followed. *Ex. 15.* |
| 8/27/10 | 5 | Reviewed the file and all FRCP related to discovery to look at options and obligations for supplementation before September 14 hearing, as well as the possibility of fee shifting. | Reviewed the file and all FRCP related to discovery to look at options and obligations for supplementation before the September 14 hearing, as well as the possibility of fee shifting and sanctions. | 8/27/09 | .5 | In the chart accompanying the complaint, the date is wrong and the phrase "and sanctions" in my entry is again faded away. This phrase is important. Clearly, BK and I were working together on researching discovery supplementation and fee shifting. It is also true, however, that I was researching the additional topic of sanctions other than fee shifting, i.e., shifting of the burdens of proof and persuasion, jury instructions, etc. No separate billing was done for the legal assistant work as there was overlapping work. |
| 8/31/10 | 2 | Prepared outline for Loring as to action plan before September 14 hearing, Researched Lowe's Loss/Safety Prevention Manager. Drafted proposed | Prepared outline as to action plan before September 14 hearing. Researched Lowe's Loss/Safety Prevention Manager. Drafted proposed interrogatory re: information | 8/31/09 | 2 | In the chart accompanying the complaint, the BK billing entry fades out the phrase "for Loring," which is important as this demonstrates collaboration. The date of the entry in the chart accompanying the complaint is also wrong. Again, this entry is explained by the fact that a lawyer and his legal assistant were collaborating and I only billed for my time. |

28

9

| Date | Time | Description of BKAG Work in Complaint Spreadsheet | Description of LJ, PLLC Work in Doc. 93-1 | Date | Time | Description of the Circumstances of the Entry |
|------|------|---------------------------------------------------|-------------------------------------------|------|------|-----------------------------------------------|
| | | interrogatory re; information on who held that position at the time of the accident. Revised and prepared cover letters to Clint Woodfin and Clerk's office. | on who held that position at the time of the accident. Revised and prepared cover letters of Clint Woodfin and Clerk's office. | | | |
| 9/9/10 | 1.25 | ██████████████ Detailed email to Loring reviewing thoughts on the supplemental documents and possible RFPs. Google search for the two other female managers mentioned by Clint Woodfin. ██████████ | Detailed email to file and staff reviewing supplemental documents of defendants and possible RFP. Google search for the other two female managers mentioned by Clint Woodfin | 9/9/10 | 1.2 | Given our custom and practice of collaboration as set forth above, I understand this to be joint work which only one of us would bill. |